# EXHIBIT A



UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | Case No. A93-0127-01-CR (HRH) |
| ) | |
| Plaintiff, ) | Anchorage, Alaska |
| ) | Thursday, August 29, 2002 |
| vs. ) | 8:39 a.m. |
| ) | |
| JAIME ERNEST MORENO, ) | CONTINUED |
| ) | IMPOSITION OF SENTENCE |
| Defendant. ) | |
| ) | |

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE H. RUSSEL HOLLAND
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:          DEBBY SMITH
                            U.S. Attorney's Office
                            222 West 7th Avenue, #9
                            Anchorage, Alaska 99513
                            (907) 271-5071

For the Defendant:          MITCHEL J. SCHAPIRA
                            310 K Street, Suite 200
                            Anchorage, Alaska 99501
                            (907) 264-6666

For Probation:              ERIC ODEGARD
                            U.S. Probation Service
                            222 West 7th Avenue, #48
                            Anchorage, Alaska 99513
                            (907) 271-5494

Court Recorder:             ELISA SINGLETON
                            U.S. District Court
                            222 West 7th Avenue, #4
                            Anchorage, Alaska 99513
                            (907) 677-6105

Transcription Service:      TAMSCRIPTS
                            P.O. Box 20433
                            Rochester, New York 14602
                            (585) 359-8118

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

1    ANCHORAGE, ALASKA - THURSDAY, AUGUST 29, 2002

2

3        (Call to Order of the Court at 8:39 a.m.)

4        THE CLERK:  All rise.  His Honor the Court, the United

5    States District Court for the District of Alaska is now in

6    session, the Honorable H. Russel Holland presiding.  Please be

7    seated.

8        THE COURT:  Good morning, ladies and gentlemen.  This

9    is the continuation of the sentencing hearing in A93-127

10    Criminal, United States vs. Moreno.  This case, which is

11    probably my longest running criminal case ever, had its

12    beginning in October of 1993, when a -- an indictment was

13    returned against Mr. Moreno.  On the 14th of March, 1994, a

14    plea agreement was entered into.  A change of plea was taken.

15    Mr. Moreno was continued on bail.  He was interviewed on that

16    day in connection with his plea agreement, which plea agreement

17    contained an agreement to cooperate.

18        On the 14th of March, the process of interviewing Mr.

19    Moreno started but was not completed.  The Court finds that it

20    was clearly contemplated by Mr. Moreno's then-counsel that the

21    interviews would continue, and the Court finds that it was

22    understood by all that they would continue without Mr. Scotti

23    being present.  It is clear to me, both from what's in the

24    record here and from my own recollection of what went on on

25    March 14th, that Mr. Scotti's recall of what went on at that

3

1  time is not very good.

2          I've checked my own calendar and find that the Moreno

3  change of plea was first set for 8:30 in the morning, was then

4  moved to 11 in the morning, and was subsequently moved to the

5  early afternoon.  And it's not clear from my calendar whether

6  it was 1:30 or 2 o'clock.  And I have a clear recollection that

7  there were difficulties in getting the plea agreement together.

8  I also have a clear recollection that Mr. Scotti was very

9  anxious to get back to Los Angeles.  Mr. Scotti participated in

10  that first March 14 interview of his client.  And I find,

11  again, that it was clearly understood that those interviews

12  would continue and that they would continue out of the presence

13  of Mr. Scotti.

14          Early on in this sentencing proceeding, there was a

15  contention that there was no interview on March 16 and 17.

16  What has developed shows that that contention was totally

17  frivolous.  There is absolutely no doubt, from the testimony

18  that I have received and from the contemporaneous records that

19  were made and have been introduced in connection with this

20  hearing, that Mr. Moreno was interviewed on March 16 and 17,

21  1994.  And it is equally clear that on the 17th, Mr. Scotti was

22  again involved in the case by telephone, that he knew at that

23  point that the interviews (a) had gone on, (b) had not gone

24  well, and (c) Mr. Scotti was urging that they continue.  And he

25  must necessarily have understood then, as before, that they

1    were going on out of his presence.

2            The Court finds that there was no impropriety whatever

3    in the government continuing the interviews of Mr. Moreno on

4    the 16th and 17th of March out of the presence of his attorney.

5    That was contemplated by the parties, and neither Mr. Scotti

6    nor the defendant ever questioned that process.

7            Getting closer now to what really needs to be decided

8    here.  I have heard and evaluated the testimony of FBI Agent

9    Henderson.  I find that she is both experienced and credible.

10   I think it's very unfortunate that we did not have 302's to

11   work with in this case.  In retrospect, what has happened here

12   is demonstrative of the reason for creating good records of

13   what has gone on in the past because in the future, you

14   sometimes wind up needing that information and it needs to be

15   in an organized fashion.  All of us here have had to deal with

16   Agent Henderson's notes that were cryptic, very hard for

17   someone else to understand.  But I have absolutely no doubt

18   that she is able to understand her notes, that she is able to

19   use them to refresh her recollection, that her reconstructions

20   are accurate.

21           The notes were contemporaneously made and, again,

22   have -- have, in my view, been reliably translated and related

23   to us for the purpose of -- of providing significant

24   information as to the results of the interviews with Mr.

25   Moreno.  Where Agent Henderson's notes did not refresh her

1    recollection, it is clear that some of the fine detail in those

2    notes, which were contemporaneously made, provide accurate

3    information to us as -- as to those fine details.  But again, I

4    say it would have been very nice if that information had been

5    organized either early on or -- or even at the outset of -- of

6    this hearing, it would have been helpful to have something

7    better than Exhibit 9, which was meaningful and useful to the

8    agent and to me in making a decision here.  But a much better

9    job could have been done of -- of organizing that information

10   for the assistance of all of us.

11            It is clear to the Court, and I find, that an

12   extensive FBI investigation was undertaken with respect to the

13   drug dealing and the persons with whom Mr. Moreno was involved

14   in drug dealing.  Agent Henderson interviewed Mr. Echavarria

15   extensively.  As I have indicated, she interviewed the

16   defendant here on March 16th and 17th.  I don't know that it

17   makes any difference that we determine who corroborated who,

18   but the point here is that the information provided by

19   Echavarria and the information provided by the defendant

20   himself was really remarkably consistent.  They were telling

21   the same story about Mr. Moreno's drug dealing.  Fine detail

22   may have differed a bit, but it -- it really is striking how

23   consistent their information is in terms of the bottom line

24   here.

25            The government is entitled to use the defendant's

1    admissions in this proceeding not just because they are

2    admissions against interest but because of the express terms of

3    the plea agreement which was entered into.  That plea agreement

4    contemplated cooperation, but it also contemplated that if the

5    defendant failed to cooperate, which he did fail to do, the

6    government was entitled to prosecute Mr. Moreno on the basis of

7    his own statements, and it necessarily follows that the

8    government is entitled to use the information received from him

9    in support of their contentions about relevant conduct as

10   regards the offense of conviction in this case.

11         Nowhere in this proceeding has anyone meaningfully

12   suggested that Echavarria's information to Agent Henderson was

13   inaccurate, nor has anyone meaningfully demonstrated that

14   Echavarria was piling it on, that he was simply making stuff up

15   to feather his nest and cause trouble for Mr. Moreno.  Again,

16   what's important here is that the information that came from

17   Mr. Moreno himself was consistent with what Echavarria was

18   telling the FBI agent.

19         I find that what Mr. Moreno said of his own dealing

20   was factual and that it was credible, which perhaps leaves us

21   with a question, why did the government take the position that

22   he was being less than truthful in his cooperation with the

23   government.  And I infer from what I have heard that the

24   problem was not at all with Mr. Moreno's discussion of his own

25   doings but, rather, the problem was with the upcoming trial of

7

1    Mr. -- was it Jimenez, that was scheduled for the week

2    following the proceedings with respect to Mr. Moreno.  And I

3    infer that when push came to shove, Mr. Moreno was not able or

4    willing to tell what he knew about that other defendant.  And I

5    infer that that's why the plea agreement fell apart.  And I

6    find that what Mr. Moreno said about himself was more probably

7    than not true and accurate.

8        (Side conversing)

9            THE COURT:  Based upon the testimony and the exhibits

10   in front of me, I find that Mr. Moreno is chargeable in terms

11   of relevant conduct with 21 kilograms of cocaine, the source of

12   which was a man by the name of Velez Montoya.  I find that

13   there was another at least five kilograms that came to the

14   defendant from Mr. Echavarria.  Likely, there was seven, not

15   five, and possibly as much as 13.  But for purposes of my

16   calculation, I'm finding that there was for sure five kilograms

17   that came from Echavarria.  And finally, of course, there's the

18   count of conviction that involved two kilograms.  Twenty-one

19   plus five plus two equals 28 kilograms of cocaine.  That

20   converts to 5,600 kilograms of equivalent marijuana.  And the

21   defendant attempted to obtain some 20 pounds of marijuana,

22   which adds not quite 10 kilograms of marijuana, for a total of

23   5,610 kilograms of equivalent marijuana for purposes of

24   relevant conduct.

25            Now there has been an argument here that -- that much

8

1    of the cocaine that I've been discussing cannot be relevant

2    conduct because of a theory of what the conspiracy was in this

3    case, but this quantity of drugs that we're talking about does

4    not depend on any sort of conspiracy theory.  What we're

5    looking at here and what I am counting are drug deals that the

6    evidence shows Mr. Moreno was personally involved in.  We are

7    not imputing to him relevant conduct of some other conspirator.

8    And because that is the posture of the case, we are talking

9    about conduct that is part of the same course of conduct as the

10   count of conviction.

11        Defendant was dealing in kilogram quantities of

12   cocaine more or less continuously from April of 1991 until a

13   time after the count of conviction.  It was a continuous course

14   of conduct for purposes of the 1.1B, or whatever the -- the

15   guideline is that tells us about relevant conduct.  Considering

16   that we have 5,610 kilograms of equivalent marijuana, the base

17   offense level for purposes of sentencing in this case is 34.

18   That 5,600 kilograms is somewhat below the middle of the 3,000

19   to 10,000 guideline range with respect to equivalent

20   marijuana.

21        The presentence report in this case finds that there

22   should be a two-level adjustment for the defendant's willful

23   failure to appear in connection with sentencing in this case,

24   and the report, therefore, finds an adjusted offense level of

25   36.  The report finds that acceptance of responsibility should

1  not be afforded the defendant in this case and, therefore, a

2  total offense level of 36.

3        Does the government have any disagreement with the

4  offense level calculation?

5        MS. SMITH:  No.  No, Your Honor, we don't.  We agree

6  entirely that acceptance of responsibility is not appropriate

7  here.  Mr. Moreno, throughout, has attempted to manipulate the

8  system and been untruthful, and not accepted responsibility.  I

9  can provide additional argument along those lines if the Court

10  would so desire.

11        THE COURT:  We'll find out in a minute.

12        MS. SMITH:  Okay.

13        THE COURT:  Mr. Schapira, any disagreement from the

14  defense side with the calculation?

15        MR. SCHAPIRA:  Your Honor, I'm not going to rehash the

16  arguments about the amount of drugs.

17        THE COURT:  The other items.

18        MR. SCHAPIRA:  To overstate the obvious, I'm

19  disappointed.

20        THE COURT:  I understand --

21        MR. SCHAPIRA:  Okay.

22        THE COURT:  -- you don't agree but we've -- we've --

23        MR. SCHAPIRA:  Yes.  We've been there.

24        THE COURT:  -- we've thrashed that.

25        MR. SCHAPIRA:  Right.  Okay.  The flight increase is,

1  of course, appropriate, but I would like to be heard on the

2  matter of acceptance of responsibility.

3          THE COURT:  I'll hear it.

4          MR. SCHAPIRA:  The big picture is that it is extremely

5  ironic that at the first sentencing and again this sentencing,

6  the Court observes that the thing that gets him to the level

7  that he's at is the words spoken out of his own mouth.  And

8  even today, Your Honor stated that there was an interesting

9  question about why there was a contention that he was less than

10 truthful.  And in answering that rhetorical question, the Court

11 said, 'Well, I think' -- to paraphrase -- 'he was less than

12 truthful about Jimenez.'  Well, of course, being less than

13 truthful about Jimenez would go to whether or not he has been

14 cooperative.  But that's been answered, and he's gotten a  .

15 two-point dinger for that already.  But the question about

16 whether or not he accepted responsibility isn't answered by the

17 question that he is unwilling to testify against Jimenez in a

18 case in which one of Jimenez's relatives or compatriots was

19 murdered after he flipped.

20          It seems to me that if the Court finds, and -- and

21 frankly speaking, I guess I never actually articulated the fact

22 that we were abandoning the claim about not having participated

23 in those subsequent interviews.

24          THE COURT:  You -- you didn't, but it became obvious

25 that -- that that was being abandoned after a while.

11

1          MR. SCHAPIRA:   Okay.  But getting past that, in our

2    memo we talked about the fact that he has accepted

3    responsibility.  And the Court has found today that the reason

4    we're able to go beyond the count of conviction and go

5    beyond -- not just the count of conviction but the other count,

6    or the other activities that involved Mr. Echavarria and Mr.

7    Juan Carlos and that took place after that little interregnum

8    between September 30th and January of '93, was exactly that he

9    had accepted his responsibility to -- at least to Ms. -- to the

10   FBI agent.  So I would urge the Court to please consider

11   favorably this application for a two-point reduction for

12   acceptance of responsibility.

13          Now let me just say this.  Again, I'm not going to

14   rehash old arguments that I've already lost, but I will say

15   that the Court has found that this was more or less a

16   continuous activity.  The thing that ties it together and makes

17   it more or less a continuous activity are the very words that

18   came out of his mouth.  And it just seems like that is

19   acceptance of responsibility.

20          (Side conversing)

21          MR. SCHAPIRA:   Now the various outcomes that we could

22   have reached when we walked in here yesterday, according to my

23   calculations, go from 97 months to 230 -- 293 months.  And

24   under those circumstances, where the thing that is decisive

25   about that outcome are the words that he said, it seems like he

12

1   has accepted responsibility.  If you look at the presentence

2   report, it says that his role in this overall thing is unknown.

3   The only thing that gets him past that is his acceptance of --

4   I mean, that gets the government past that is his acceptance of

5   responsibility in this case.

6                THE COURT:  Ms. Smith.

7                MS. SMITH:  Your Honor, I have to assume that some of

8   the statements made by defense counsel are made because he is

9   new to the case and perhaps unfamiliar with the record.  But as

10  far as the continuing course of conduct that's been

11  established, this certainly is not based solely upon Mr.

12  Moreno's statements to the government.  It's based upon Mr.

13  Echavarria's, Helen Arismendy's, the entire investigation, as

14  well as the hotel and airline and telephone records that are

15  part of the trial record.

16               This is a situation on the issue of acceptance of

17  responsibility that could not be more clear.  I probably have

18  never seen a defendant who has been less a candidate for

19  acceptance of responsibility.  Mr. Moreno has attempted to

20  manipulate the system, really from the moment he stepped into

21  this courtroom, beginning with the appeals to this Court for

22  bail solely for the purpose of cooperating, and then failing to

23  provide that cooperation.  Both Agent Henderson and U.S.

24  Attorney Burgess testified regarding his lack of truthfulness

25  in a number of -- of the matters he was asked about.

1          He continued by fleeing and -- and being able to live

2    his life as he chose for five years, during the time in which

3    witness' memories corrode, investigations become old, and he

4    received the benefit of that.  And having received the benefit

5    of that, when he is apprehended, he continued to misrepresent

6    his status, claiming to be doing undercover operations with the

7    FBI, which is flatly incorrect.  And that he provided

8    information to the FBI where he could be contacted, again, a

9    complete falsehood.

10         And seizing the opportunity presented by five years of

11   his absence and time that lapses and the impact of that on

12   investigation, he put forward this defense challenging the

13   integrity of the prosecutor and the agent, and claiming to, in

14   fact, never have met with them in a -- in a bold attempt to get

15   out from under the consequences of the admissions that he had

16   made.

17         He continues to deny involvement in more than two

18   kilos.  So I think it is a text book example of an individual

19   who has not accepted responsibility and not shown any of the

20   indicia of potential rehabilitation that that acceptance

21   signals to the court and -- and to the public.  So we would

22   request that he not be given that.

23         I would also point out that he's received many, many

24   breaks from the government.  His initial plea, he -- had he

25   cooperated, he would have received a five-year sentence and

1   actually been about his business now.  He refused to honor the

2   contract he entered into the government with at -- at that

3   point.  When he was apprehended after he fled, he was not

4   charged with any substantive offense for that.  The government

5   has not sought inclusion of evidence that could have been

6   included in the relevant conduct related to his use of weapons.

7   And so I think he's received many breaks from the government,

8   but the acceptance of responsibility is one that the government

9   is not prepared to -- to agree to and would ask the Court to

10  not provide it in this instance.  Thank you, Your Honor.

11          THE COURT:  One moment, please.

12          MR. SCHAPIRA:  If the Court likes, I'd like to respond

13  to some of that.

14      (Pause)

15          THE COURT:  Mr. Schapira.

16          MR. SCHAPIRA:  I'll just say this.  The benefit of

17  fleeing for five years and being a fugitive and living

18  underground, and being out of the country, is a dubious

19  benefit, and it's not one that the government granted.  But

20  more directly to the point, we've already taken that into

21  consideration.  He's been upped two points for that.  To say

22  that -- the government's argument, basically, is that it's

23  impossible to have both of those two things.  And my argument

24  is that it's unusual, I agree, but it's not inconsistent.

25          It seems to me that the facts in this case are that

1    according to the findings you have made, he was accepting

2    responsibility, and the government was saying, 'We're not going

3    to give you credit for accepting responsibility.  We don't

4    believe you.'  And for that reason, he made a crucial, stupid

5    mistake out of panic and fled, and accepts the consequences of

6    that mistake.  But the government has to also accept the

7    consequences, as it were, of him accepting responsibility and

8    then sort of being told to his face, 'Well, you're a liar,

9    you're a liar,' so that he was ill prepared to deal with the

10    situation, and made a huge mistake.

11        THE COURT:  Thank you.  What we are dealing with here

12    is Guideline 3E1.1, and application note 2 provides, with

13    respect to that adjustment, that it is intended to apply to a

14    defendant -- that it is not intended to apply to a defendant

15    who puts the government to its burden of proof at trial.  And

16    that really is the -- is the crux of the -- of the problem

17    here.  It is -- it is not inaccurate for Mr. Schapira to argue

18    that -- that the Court has looked hard at the defendant's own

19    statements.  Indeed, he took the stand in a trial and -- and --

20    and -- and more or less confessed the count of conviction in

21    his -- in his cross examination.

22        So at -- at various times, it is fair to say that --

23    that Mr. Moreno has confessed what he was doing, has admitted

24    what he was doing.  That simply doesn't amount to acceptance of

25    responsibility under this guideline, which provides that only

1    in exceptional situations can a person who goes to trial, which

2    Mr. Moreno chose to do, get this adjustment.   The exceptions

3    that -- that are suggested by the -- by the application note

4    are to preserve constitutional issues and that sort of thing.

5    We don't have anything in this case that -- that -- that was

6    being preserved by going to trial.

7              I think this trial was simply to put the government to

8    the test to see whether or not they still had the evidence that

9    would convict Mr. Moreno and, as it turns out, they did.   The

10   two-level downward adjustment for acceptance of responsibility

11   will not be allowed in this case.   The Court finds that the

12   defendant's total offense level is 36.

13             Turning to the defendant's criminal history category,

14   he has four criminal history points based upon prior

15   convictions.   He was on probation at the time of the offense of

16   conviction, which adds two points.   He committed the offense of

17   conviction within two years of his release from prior

18   confinement.   That adds another point, for a total of seven

19   criminal history points.

20             In evaluating this matter before, I took the position

21   that -- that the cumulative effect of -- of the add-ons for

22   being on probation and being within two years of one's release,

23   and the nature of the underlying convictions which basically

24   were some moderately low-range thefts, overstated the

25   defendant's criminal history category, and I don't see any

1   basis for -- at this point, for -- for changing my view of that
2   matter.  I think -- I think a criminal history category IV
3   is -- is a bit high.  Seven is at the very bottom of -- of the
4   category.  I'm going to depart one -- one point downward with
5   respect to criminal history category and -- and find that the
6   defendant's criminal history category should be III, unless
7   somebody has a persuasive argument that -- that I've overlooked
8   something.
9           .  MS. SMITH:  We have no objection.
10          .  THE COURT:  Mr. Schapira.
11             MR. SCHAPIRA:  No, sir.
12             THE COURT:  Okay.  The Court finds that the
13  defendant's criminal history category is III.  Extending the
14  offense level 36, criminal history category III into the
15  sentencing matrix, we're looking at 235 to 293 months for
16  imprisonment.  Probation is not available.  Supervised release
17  is in the range of four to five years.  Fine range is 20 to --
18  $20,000 to $2 million.  Special assessment, I guess is $50
19  because of the age of this case.  Is that right?
20             THE PROBATION OFFICER:  Yes, Your Honor.
21             THE COURT:  Yes.  Thank you.  Is there any
22  disagreement with those extensions of the guideline factors?
23             MR. SCHAPIRA:  No, sir.
24             MS. SMITH:  No, Your Honor.
25             THE COURT:  Okay.  Ms. Smith, any final thoughts on

1    what I should do at sentencing in this case?

2              MS. SMITH:  No, Your Honor.

3              THE COURT:  Mr. Schapira.

4              MR. SCHAPIRA:  With all my heart, I'm going to

5    restrain from rehashing old arguments.  But here's where I

6    think he -- I think he should be at the very low end of that

7    range, which is approximately 20 years.  And the reason I come

8    to that conclusion is because the offense of conviction, the

9    facts as I understand them are that there was someone who had a

10   usual source of drugs and couldn't get them from that source,

11   and so he called someone he knew who he thought might -- could

12   have a connection, and that person -- Mr. Moreno delivered the

13   drugs and earned for himself $500 or something like that.

14             Now that's the offense of conviction, and it is

15   magnified and enlarged because of the nature of relevant

16   conduct, which you have found is part of a more or less

17   continuing series of events.  If the Court were to take a

18   slightly different -- or let me say a more refined view of

19   whether it was part of the same events, not inconsistent with

20   that view, you could reasonably conclude as follows.  That when

21   Mr. Echavarria called him up and said, 'Look, you know, my

22   usual source is away.  I'm having trouble here.  I need this.

23   Can you help me?'  He didn't pick a name at random out of the

24   phone book.  He picked someone who, you know, had a reputation

25   for having done this once or twice, or -- or, as you have

1     found, 14 times before, or something like that.

2              But the normal case in which someone manages to work

3     his way up to a level 34 before you take acceptance of

4     respons- -- before you take flight into consideration, the

5     normal case in which someone is not engaged in a more or less

6     continuous operation but has an ongoing business relationship

7     with the same people, that has no substantial breaks in the

8     action.  And because of that distinction, I think that his case

9     is mitigated in comparison to the usual person who finds

10    himself in a 20-year-to -- what would that be, a 25-year range,

11    more or less.

12             When you come down to it, the con- -- the

13    conviction -- I don't want any word I ever say, at least not

14    from now until election day, to be taken as an endorsement

15    of -- of drug use or drug dealing or anything like that.  It's

16    a serious thing.  Okay.  But there's such a wide disparity or

17    discrepancy in how people get treated, that when you step back

18    and look at this individual, 20 years is an awfully long time,

19    and that's why I would urge you to stay at the low end of that

20    range.

21             THE COURT:  Mr. Moreno, is there anything you want to

22    tell me before I impose sentence?

23             THE DEFENDANT:  Yes, Your Honor.

24             THE COURT:  Go ahead.

25             MR. SCHAPIRA:  May I have a word with my client,

1   please.

2        (Pause - side conversing)

3                    ALLOCUTION

4        THE DEFENDANT:  Yeah, Your Honor.  What I have to add

5   is, the -- that I did make a big mistake.  I have put my family

6   through a lot of suffering and pain, especially my mother.

7   She's 76 years old and I don't think I'll be able to see my mom

8   alive, and free.  My kids, I got two beautiful daughters.  I've

9   been married for 19 years.  And you're right, I took this to

10  trial.  I did try to make a deal.  They never came up with a

11  written deal.  I have letters from Scott Dattan, when I told

12  him, he came up with a 78-months deal, and I told him put it

13  on -- put it on writing.  And then he said that Mr. Rosenbaum

14  talked to Mr. Burgess and Mr. Burgess said, 'No, we're not --

15  we're not making him a deal.'  So that's why I decided to go to

16  trial.  The next day, he came back and he said, 'They're not

17  going to put a -- they're not going to make you a deal unless

18  you get a deal for five to 40 years, an open sentence.'  So I

19  had no choice.

20        I do got to say that -- sorry, and I know there is no

21  excuses for me to have been involved in drugs.  I said it once

22  before, my family are completely devastated.  They're --

23  they're completely -- they're hurting every day, as much as I

24  do, too..  And I hope you don't give me a fine because I don't

25  have any money.  I've been borrowing money from my sister as

1  loans to pay my attorneys.  And I wish you can give me a better

2  break than 20 years.  If you do take the fine, I'll -- I can

3  work at the prison, which I have been as a tutor teaching GED

4  for the past year, encouraging people not to get involved with

5  drugs and to look at me, you know, what's happening in my life

6  and how much I've been hurting my family through my bad

7  judgments.

8      I do urge you to -- to see if you give me less than 20

9  years, you know, because I'm already 42 years old and I got two

10 kids that I got to, you know, try to help.  In 20 years,

11 they'll be almost 30, by the time I get out.  And like I said,

12 I've been working in Mississippi as a tutor.  I encourage

13 everybody not to take the -- the easy way, the way I took it.

14 And they do listen.  I don't know if when they come out, when

15 they get out, they going to take my advices, but I -- I think

16 20 years is a long time for me to spend in prison to learn what

17 I have learned already in this past three and a half years of

18 incarceration.

19      And you know, they got (indiscernible) companies in

20 Mississippi because -- oh, I wish you can send me also

21 somewhere in California, to put a word to send me to Lompoc

22 because I haven't seen my family in almost four years, three

23 and a half years, and I would like to see, you know, my -- my

24 kids.  I would like to see my mother, my -- my dad, my -- my --

25 my family, my whole family.  So that's it.

1    THE COURT:  All right.  Thank you.  Give me just a

2    moment, please.

3        (Pause - side conversing)

4                    IMPOSITION OF SENTENCE

5    THE COURT:  Mr. Moreno has been found guilty after

6    trial by jury of Count I of the indictment, charging a

7    violation of 21 U.S.C. §846, conspiracy to possess controlled

8    substances with intent to distribute.  Based upon that

9    conviction, it is the judgment of the Court that Jaime Ernest

10   Moreno be committed to the custody of the United States Bureau

11   of Prisons for incarceration for a period of 235 months.

12       Upon release from imprisonment, the defendant shall be

13   on supervised release for a term of five years.  Within 72 of

14   his release from the custody of the Bureau of Prisons,

15   defendant shall, if he is not deported, report to the Probation

16   Office in the district to which he is released.

17       (Side conversing)

18   THE COURT:  The Court recommends that this sentence be

19   carried out at the federal correctional institution at Lompoc,

20   California, or some other institution in the vicinity of

21   southern California.  While on supervised release and if in the

22   United States, the defendant shall not commit another federal,

23   state or local crime, shall not possess a firearm or illegal

24   controlled substance, and shall comply with the standard

25   conditions of supervision which will appear in printed form in

1  the Court's judgment.  Defendant shall also comply with the

2  following special conditions.

3         First, if in the United States, defendant shall submit

4  to the warrantless search of his person, residence, vehicle or

5  place of employment, at reasonable times, in a reasonable

6  manner, and based upon a reasonable suspicion of the presence

7  of contraband or evidence of a violation of a term or condition

8  of supervised release.  Failure to -- failure to submit to such

9  searches may be grounds for revocation of supervised release.

10 Defendant shall not reside at any location without first

11 advising other residents that the premises may be subject to

12 searches pursuant to this condition.

13        Second, the defendant, if in the United States, shall

14 not possess a firearm, destructive device or other weapon.

15        Third, the defendant shall comply with the rules and

16 regulations of the Immigration and Naturalization Service and

17 if deported from the United States, either voluntarily or

18 involuntarily, shall not reenter the United States illegally.

19 Upon any -- upon any reentry into the United States during the

20 period of court-ordered supervision, the defendant shall report

21 to the nearest United States Probation Office within 72 hours.

22        The Court finds that the defendant does not have the

23 ability to pay a fine and, therefore, no fine is imposed.

24 Also, the requirement of drug testing is not imposed in this

25 case because the statute that made that requirement was not in

1  effect at the time of the offense of conviction here.  The

2  special assessment in the amount of $50 is imposed and is due

3  and payable immediately.

4       Mr. Moreno, if you wish to appeal either the jury

5  verdict or this Court's sentencing decisions, you have the

6  right to appeal to the Ninth Circuit Court of Appeals.  If you

7  wish to take an appeal and do not have the wherewithal to

8  take -- to hire an attorney to assist you on an appeal, one can

9  be appointed to assist you.  The time for taking an appeal in a

10 criminal case is relatively short.  It's 10 days.  Now you

11 should assume that the judgment will be entered today or

12 tomorrow, and the 10 days will run from the entry of judgment.

13      Is there anything further we need to do, Ms. Smith?

14      MS. SMITH:  Your Honor, one housekeeping matter for

15 the purpose of the record.  We have two Exhibit 12's in this

16 case.  One is the Scotti --

17      THE COURT:  Oh, yes.

18  (Side conversing)

19      MS. SMITH:  -- letter and the plea agreement that was

20 entered.  And we would request that the plea agreement be

21 labelled as Exhibit 12A.

22      THE COURT:  And in fact, someone has already done

23 that.  I -- I noticed it when -- when I was reviewing the

24 exhibits.  And the record should reflect that -- that the plea

25 agreement is Exhibit 12A, not 12, as -- as is discussed in the

1   record.

2       (Side conversing)

3           MS. SMITH:  And Your Honor, one final thing.  I assume

4   there's no restitution in -- in this case?  None is requested

5   and --

6           THE COURT:  That --

7           MS. SMITH:  -- none appropriate.

8           THE COURT:  That is correct.

9           MS. SMITH:  Thank you.

10      (Pause - side conversing)

11          THE COURT:  Is there anything further, Mr. Schapira?

12          MR. SCHAPIRA:  Not from me, Your Honor.

13      (Side conversing)

14          MR. SCHAPIRA:  Not from me, Your Honor.

15          THE COURT:  Thank you.  We'll be in recess subject to

16   call.

17          THE CLERK:  All rise.  This matter is now adjourned.

18   This court stands in recess subject to call.

19      (Proceedings concluded at 9:29 a.m.)

20

21

22

23

24

25

CERTIFICATION

I certify that the foregoing is a correct transcript from
the electronic sound recording of the proceedings in the above-
entitled matter.

_Tammie Heinrich_                    _2/24/03_
Tammie Heinrich, Transcriber          Date