Jaime Ernest Moreno
Reg. 00809-112
P.O. Box 7001/A1A
Taft, California 93268

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Respondent, ) | |
| ) | |
| vs. ) | Civil No.: _____ |
| ) | Related to Criminal Case No.: |
| JAIME ERNEST MORENO, ) | A93-0127 CR (HRH) |
| ) | |
| Petitioner. ) | |

### MEMORANDUM OF LAW IN SUPPORT OF HABEAS CORPUS
### MOTION TO VACATE, SET ASIDE, OR CORRECT
### SENTENCE OURSUANT TO 28 U.S.C. § 2255

### I.  HISTORY OF THE CASE

A.  Statement of Facts

On January 24, 1993, at 12:12 a.m., Helen Arismendy was arrested at the Anchorage, Alaska International Airport. [Tr. TBJ-1, p. 12-14][1] Her suitcase was searched pursuant to a search warrant, and FBI agents discovered a Tide detergent box containing two kilograms of cocaine. [Tr. TBJ-1, p. 17-22, 25-29]

Ms. Arismendy testified at trial against Mr. Moreno. She said that Mr. Moreno supplied her with the two kilograms of cocaine about 2:00 p.m. on January

---

[1] The designation "Tr. TBJ-1" refers to the Transcript of the Trial By Jury - Day 1 on April 22, 2002.

23, 1993, in an apartment in the Los Angeles, California area. [Tr. TBJ-1, p. 80-82]   Ms. Arismendy testified that her sole contact with Mr. Moreno occurred at that apartment.   [Tr. TBJ-1, 104]   She said that she only saw Mr. Moreno "very briefly."  She said Mr. Moreno appeared to the "in a hurry," and went in and out of the apartment quickly.   [Tr. TBJ-1, p. 81]   She said he gave the cocaine to (Jose) Dario Echavarria, a man she had been working with to obtain the cocaine.   Id.   She said she had previously given $ 32,000 to Mr. Echavarria. Mr. Echavarria gave this money to Mr. Moreno, and Mr. Moreno "got out as fast as he could."  [Tr. TBJ-1, 81-82]

Ms. Arismendy said she was in the apartment bedroom when she saw Mr. Moreno give Mr. Echavarria the cocaine.   [Tr. TBJ-1, p. 83-84]   She said she was able to see Mr. Moreno clearly, and, at trial, she identified his photograph. (Tr. TBJ-1, p. 82-84]

Ms. Arismendy lived in Henderson, Nevada (a suburb of Las Vegas) at the time.   [Tr. TBJ-1, p. 70]   She testified that she was contacted by an Anchorage, Alaska resident named Victor Neira in early January 1993.   [Tr. TBJ-1, p. 70-71]   Mr. Neira asked her to obtain two kilograms of cocaine and bring it to Anchorage.   [Tr. TBJ-1, p. 72]   She, in turn, contacted her niece Martha Velez-Montoya for assistance in obtaining the cocaine.   [Tr. TBJ-1, p. 74-76]   Ms. Velez-Montoya took Ms. Arismendy to Los Angeles and introduced her to Mr. Echavarria.   Mr. Echavarria said he could obtain cocaine, but apparently did not have any then.   So. Ms. Arismendy returned to Nevada.   [Tr. TBJ-1, p. 76-77]

On January 22, 1993, Mr. Echavarria contacted Ms. Arismendy and said he could obtain cocaine for her.   [Tr. TBJ-1, p. 77]   Ms. Arismendy flew to Los Angeles.   Mr. Echavarria took Ms. Arismendy to the Embassy Suites Hotel in Downey, California.   The next day, Mr. Echavarria rode around in his car with Ms. Arismendy trying to obtain cocaine.   [Tr. TBJ-1, p. 77-79]   Another man,

Orlando Arango, accompanied them. [Tr. TBJ-1, p. 94-95] At first, they were unable to find any cocaine. Then Mr. Echavarria said he was going to talk to a man he referred to as "El Loco." [Tr. TBJ-1, p. 79-80] Mr. Echavarria contacted this man and said he could supply the cocaine. [Tr. TBJ-1, p. 80]

Mr. Echavarria dropped Ms. Arismendy and Arango off Mr. Echavarria's Apartment while he met "El Loco." [Tr. TBJ-1, p. 80] She and Mr. Arango waited for about 45 minutes until Mr. Echavarria returned. [Tr. TBJ-1, p. 80, 95] When he returned was accompanied by Mr. Moreno (the man Mr. Echavarria was referring to as "El Loco"), and the transaction occurred as described above. [Tr. TBJ-1, p. 80-81]

Ms. Arismendy said she packed the cocaine in a Tide detergent box. [Tr. TBJ-1, p. 84-85] Mr. Echavarria said that he did not want her at his apartment anymore and gave her a ride to another hotel. [Tr. TBJ-1, p. 83] She said she obtained an airline ticket and flew to Anchorage, where she was arrested as described above. [Tr. TBJ-1, p. 85-86]

The Government introduced physical evidence corroborative of Ms. Arismendy's testimony. Special Agent Lou Ann Henderson of the FBI arrested Ms. Arismendy on January 24, 1993. [Tr. TBJ-1, p. 12-13] The Tide detergent box, the cocaine, and other items seized during the arrest were admitted into evidence. [Tr. TBJ-1, p. 17-22, 25-28, 30-31] In addition, Special Agent Henderson provided a number of receipts, telephone records, and the airline ticket Ms. Arismendy used. [Tr. TBJ-1, p. 16, 33-39, 40-46]

The Government also called witnesses who testified about admissions Mr. Moreno made. A Pretrial Services Officer who interviewed Mr. Moreno concerning the present offense testified that Mr. Moreno said that "Dario" contacted him and asked him to look for two kilograms of cocaine. [Tr. TBJ-2, p. 31-32][2] Mr.

_____

[2] The designation "Tr. TBJ-2" refers to the Transcript of the Trial By Jury – Day 2 on April 23, 2002.

Moreno asked Mr. Echavarria if he had the money. Mr. Echavarria said he did. [Tr. TBJ-2, p. 32] Mr. Moreno said went looking for cocaine and contacted a man named Juan Carlos. [Tr. TBJ-2, p. 33] Juan Carlos brought the cocaine to a gas station near Mr. Echavarria's apartment. Id.

Mr. Moreno said that he got the cocaine from Juan Carlos and went to Mr. Echavarria's apartment. They met in the parking lot and then went upstairs to the apartment. [Tr. TBJ-2, p. 33] Mr. Moreno said that he handed the suitcase containing the cocaine to Mr. Echavarria before they went inside. [Tr. TBJ-2, p. 34] He said Mr. Arango was inside, along with a woman who put her head and went into the bathroom. He said Mr. Echavarria, Mr. Arango, and the woman all went into the bathroom while he stepped outside. Several minutes later, Mr. Echavarria came out and gave him a bag with money in it. [Tr. TBJ-2, p. 34-35]

Mr. Moreno said he took the money to Juan Carlos who was waiting in the parking lot. He said that Juan Carlos gave him $ 500 for arranging the transaction. [Tr. TBJ-2, p. 35] Mr. Moreno made a similar statement to Detective Tommy Lee Rackleff of the Westminter, California Police Department. [Tr. TBJ-2, p. 14-15, 24-26] Officer Rackleff arrested Mr. Moreno on October 15, 1993. [Tr. TBJ-2, p. 16]

Mr. Moreno took the stand and testified in his own behalf. He said essentially what he said to Mr. Fynes, the Pretrial Services Officer, and acknowledged what he said to Mr. Fynes was true. [Tr. TBJ-2, p. 46] However, he also gave additional testimony concerning his relationship with Mr. Echavarria. He said that he met Mr. Echavarria at an automobile detailing shop he (Mr. Moreno) owned in North Hollywood. [Tr. TBJ-2, p. 4] He said that when Mr. Echavarria came around, he tried to "push dope" and acted "bad." [Tr. TBJ-2, p. 41-42]

4

Regarding the present charges, Mr. Moreno said that Mr. Echavarria called him and asked him if he could get two kilograms of cocaine. [Tr. TBJ-2, p. 42] Mr. Moreno said he was scared to get Mr. Echavarria a big amount like that, but he did know Juan Calos. [Tr. TBJ-2, p. 42-43] He called Juan Carlos, who said he had the kilos. He said he met Juan Carlos in the gas station, delivered the cocaine, and got the $ 500 in the manner set out above. Id.

Mr. Moreno testified that he did not know have any dealings with any of the people the government said were involved in the case with the exception of Mr. Echavarria. [Tr. TBJ-2, p. 43-44] He said he may have seen Mr. Arango before at his detailing shop. [Tr. TBJ-2, p. 46-47] He said he did not recognized Ms. Arismendy. [Tr. TBJ-2, p. 46] He said that he had done drug transactions with Mr. Echavarria before but in grams and ounces not kilos and not in transporting drugs to different places. [Tr. TBJ-2, p. 47-48]

Naturally, Mr. Moreno was vigorously cross-examined. He admitted that Mr. Echavarria or whoever eventually got the two kilograms would most likely break it down into grams or ounces and further distribute it. [Tr. TBJ-2, p. 48-52] Mr. Moreno admitted he had an agreement with Juan Carlos that he would take the cocaine, give it to Mr. Echavarria, get the money, and bring the money to Juan Carlos. [Tr. TBJ-2, p. 52-54] The prosecutor suggested this was "fronting," but Mr. Moreno said it was not actually fronting because Juan Carlos was just around the corner. [Tr. TBJ-2, p. 52-53] Mr. Moreno also admitted he had an agreement with Mr. Echavarria to procure two kilograms of cocaine in exchange for the money. And Mr. Moreno agreed that purpose of the agreements "was to transfer two kilograms of cocaine from Juan Carlos to Mr. Echavarria." [Tr. TBJ-2, p. 54]

B.  **Course of Proceedings**

1.  **Pre-trial and Trial Proceedings**

This case has a long procedural history.  The conspiracy Mr. Moreno was charged with allegedly took place in January 1993.  He was arrested in October 1993.  [Tr. TBJ-2, p. 16]  This case has been before this court in **United States v. Jaime Ernest Moreno,** No. 99-30347, D.C. No. CR-93-00127-HRH.  The Presentence Report has a summary of the lenghtly proceedings that took place before Mr. Moreno's trial by jury and sentencing.  [PSR, p. 1-2]

Mr. Moreno was tried by jury in Anchorage before the Honorable H. Russel Holland on April 22 through 23, 2002.  The evidence presented at trial set out in the Statement of Facts section above.  Moreno made a motion for judgment of acquittal at the close of the government's case but the district court denied the motion.  Moreno went on to present a case consisting of Mr. Moreno's testimony.  Mr. Moreno trial attorney did not challenge at sentencing the drug quantity that was attributed to Mr. Moreno due of incriminating statements allegedly made by him to Special Agent Henderson on March 16 & 17 without the presence of his counsel.  Here, the Government during sentencing has no offered that Mr. Moreno waived his prior asserted right to counsel.

2.  **Sentencing Proceedings**

The sentencing proceedings in this case are very lengthy.  But, on August 29, 2002, after hearing two days of testimony and argument, Judge Holland made his findings on the record.  These findings are included as Exhibit A.

First, there are two findings that are not contested.  Mr. Moreno concedes that his offense level should be adjusted upward for obstruction of justice for his failure to appear.  [Exhibit A at 8]  See Guideline § 3C1.1, Application Note 4(e).  Mr. Moreno also agree that, based on the court's findings concerning his

6

criminal history (including an adjustment for overstatement), Mr. Moreno's Criminal History Category was III. [Exhibit A at 17]

The main issue that needed to be resolved was whether the offense level should be adjusted upward based on "relevant conduct," pursuant to § 1B1.3, when Special Agent Henderson initiated an interrogation and she "deliberately elicited" incriminating statements from him in violation of his Sixth Amendment right to counsel. The amount of cocaine involved in the present offense was two kilograms. But, applying § 1B1.3(a)(2), the district court found that the present offense was "part of the same course of conduct" as uncharged offenses involving 26 additional kilograms of cocaine and 20 pounds of marijuana. [Exhibit A, at 7-8] Applying the drug quantity and equivalency tables in Federal Sentencing Guideline § 2D1.1, the found that Mr. Moreno's base offense level was 34. Adding the obstruction of justice points, the level rose to 36. [Exhibit A at 8-9] The resulting sentencing range, with Moreno's Category III Criminal history was 235 to 293 months. A 235 sentence was imposed. [Exhibit A at 22]

The "relevant conduct" findings made a huge difference. Had Mr. Moreno been sentenced only for the statutory drug quantity of 21 U.S.C. § 841(b)(1)(B) (more than 500 grams but less than 5 kilograms of cocaine) as charged in the indictment his sentence would have been considerably less lengthy. As Moreno calculates it, the base offense level would have been 28. Adding the two obstruction of justice points makes the offense level 30. Applying category III to this level results in a sentencing range of 121 to 151 months.

If Mr. Moreno had been sentenced (at the low end of the range) for the two kilograms alone as found by the jury, he would be serving a bit more than 10 years. Under this current sentence, he is serving over $19\frac{1}{2}$ years. The difference is over 9 years in jail.

The proceedings on "relevant conduct" were complex. One of the

observations made by Judge Holland before he imposed the sentence was that the parties had not done a good job organizing their presentations on "relevant conduct." [Exhibit A at 5]  To try to remedy this shortcoming, Mr. Moreno decided to present the material in a table format according to the interviews that took place.  The March 16, 2001, interview is placed first since Mr. Moreno allegedly admitted to most conduct here.  Mr. Moreno apparently acted as a middleman on most occasions.  He allegedly obtained cocaine from a "Source" either Mr. Gustavo Velez-Montoya ("GV-M" in the table) or (Jose) Dario Echavarria ("DE" in the table) and delivered it to other people - "Customer".

## MARCH 16, 1994 INTERVIEW

| Trans-action Number | Date of Conduct | Source | Customer | SA Henderson's Notes | Am't in Kilos |
|---|---|---|---|---|---|
| 1 | April 1991 | GVM | "Can't remember" | "First deal" with GV [ER, p. 38] | 1 |
| 2 | "One or two weeks" later [ER, p. 38] | GVM | Iranian (Armenian) Buyer – "JAFF" | | 1 |
| 3 | "2-3 days" later [ER, p. 39] | GVM | "same customer" | GVM says he's going to deal in the "big 'North'." [ER, p. 39] | 2 |
| 4 | "one or 2 wks" [ER, p. 39] | GVM | Armenian – Middle East | GVM says he wants nice car. BMW. [ER, p. 39] | 1 |
| 5 | "5/91" | GVM | Moreno | "BMW" – deal fell through. 1 Kilogram returned. | 1 |
| 6 | "3-4 Months … Nothing"(August 1991) | GVM | Mexican customer – Chu-Chu | Met Martha & GVM at gas station. Martha delivers drugs. | 2 |
| 7 | "2 days | GVM | Mexican | Same Mexican customer – | 2 |

|  |  |  |  |  |  |
|---|---|---|---|---|---|
|  | later" (Fall 1991) |  | guy – (Chu-Chu?) | unhappy with quality. Returned the 2 kilos. GVM went to Sam's U-Haul. Got 1 kilo from Jorge. Delivered 1 to Mexican. |  |
| 8 | "No date" | GVM | Mexican | In Centa. "1 kilo – Mexican" | 1 |
| 9 | Late 1991 | GVM | Cocaine ripped off from car. | GVM says Mother is very sick. Going to Columbia. "Very soft" only takes 1 kilo. Puts in car – . | 1 |
| 10 | possibly May 1992 | GVM |  | GVM back. Buried mother. Out of this business. "Beeped Gustavo – 1 kilo." Argument with Jorge at U-Haul. Sister will take care of business. | 1 |
|  |  |  |  | *Total* | *13* |

## MARCH 14, 1994 INTERVIEW

| Trans-action Number | Date of Conduct | Source | Customer | SA Henderson's Notes | Am't in Kilos |
|---|---|---|---|---|---|
| *1* | "March 92" | GVM | Mexican customer – "Chuchu" | "bad stuff". GVM to "Sam U-Haul" Gustavo tells Jorge to get package. | 4 |
|  | (No transaction.) |  |  | "Mother died. Very depressed. Large deal. Introduce to sister. Left for Columbia. |  |
|  |  |  |  | *Total* | *4* |

## MARCH 17, 1994 INTERVIEW - [ER, p. 49-51]

| Trans-action Number | Date of Con-duct | Source | Customer | SA Henderson's Notes | Amount of Cocaine in |
|---|---|---|---|---|---|

| | | | | | Kilograms |
|---|---|---|---|---|---|
| 1 | "Nov – 1991" | GVM | "1-Kurt 1-Chu 2-Armen- ian" | GVM says Mother is sick. Plans to go up North. | 4 |
| | (No transact ion.) | | | GVM conversation at house. GVM says Mother died. Lost 1 kilo – couple months before. Previous rip off. | 0 |
| 2 | No date | DE | ? | "Tim (USAtt'y Burgess – Dario":"2 xs – 1 kilo each. 3 xs – 1 kilo each. Previously: "Dario 1 time – 2 kilos w/ Jorge." | 5 |
| | | | | Total | 9 |

The tables are taken from Special Agent Henderson's notes. These notes and the notes Special Agent Henderson made during her interviews with Dario Echavarria are included as Exhibit B. Special Agent Henderson's testimony is so voluminous that Moreno did not believe it was appropriate to include it as an Exhibit. It is clear from Special Agent Henderson's testimony that, while she remembered the interviews taking place, "specific locations, dates and amounts and transaction" all came out of her notes. [Tr. Sent-1, p. 31][3]

The grand total from all these transactions is 26 kilograms. The court also found that Mr. Moreno attempted to obtain 20 pounds of marijuana from Mr. Echavarria. [Exhibit A at 7] The 26 kilograms of uncharged cocaine, plus the 2 kilograms of cocaine from the present case were converted to equivalent marijuana adding the marijuana the total the court came up with was 5,600 kilograms of marijuana. Id. The district court went to impose a sentence including 235 months incarceration based on these findings. [Exhibit A at 22]

---

[3] The designation "Tr. SENT-1" refers to the Transcript of Sentencing on July 26, 2002.

## II.  ARGUMENTS

28 U.S.C. § 2255 requires a prisoner's sentencing court to release him or her if the prisoner's sentence was imposed in violation of the Constitution or laws of the United States, if the court was without jurisdiction to impose the sentence, if the sentence exceeded the maximum authorized by law, or if the sentence is otherwise subject to collateral attack.  The statute provides that if the court finds for the prisoner, it may resentence him or her or set the conviction aside, as is appropriate.

## A.  PETITIONER WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL

Claims of ineffective assistance of counsel raise a cognizable constitutional issue that can serve as the basis of a motion under § 2255.  See **Frazer v. United States,** 18 F.3d 778, 781 (9th Cir. 1994).  The Sixth Amendment to the United States Constitution provides that in criminal prosecutions the accused shall have the right to the assistance of counsel for his or her defense.  The United States Supreme Court has held that this right includes the right to effective assistance of counsel.  **McMann v. Richardson,** 397 U.S. 759, 771 n. 14 (1970).  Pursuant to this constitutional mandate, a defendant is entitled to reasonably competent asistance of counsel from pre-trial investigation and preparation through advocacy at sentencing.  See **United States v. Leonti,** 326 F.3d 1111, 1116 (9th Cir. 2003).

The United States Supreme Court has held that in order for a prisoner to show that counsel's assistance was so ineffective at his criminal proceedings to warrant set aside the conviction or to correct the sentence under § 2255, the prisoner must show: 1) that his counsel's acts or omissions made counsel's overall performance fall below an objective standard of reasonableness and 2) that there is a reasonable probability that, but for counsel's errors, the proceeding would

have been different. **Strickalnd v. Washington**, 104 S.Ct. 2052, 2064 (1984); **Iaea Sunn**, 800 F.2d 861, 864 (9th Cir. 1986); **Leonti**, 326 F.3d at 1120.

Under the first prong of the above test, the prisoner must show that in light of all the circumstances present at the time of his criminal proceeding, counsel's acts or omissions "were outside the wide range of professionally competent assistance." **Hoffman v. Arave**, 455 F.3d 926, 940 (9th Cir. 2006). Under the second prong, the prisoner must show a reasonable probability that, "armed with the correct information, the outcome would have been different." **Iaea**, 800 F.2d at 864. In the present case, the petitioner's counsel rendered ineffective assistance at pre-trial when he failed to inform petitioner of the option that he could have entered an open guilty plea to a sole count of the indictment, likely entitling him to three-level reduction for acceptance of responsibility, at sentencing counsel failed to pursue a challenge of the enhancement on the fact that the Government knew that petitioner's right to counsel had attached, the Government, through Special Agent Henderson, initiated an interrogation without the presence of counsel in violation of his Sixth Amendment, failed to demand an adequate factual basis for drug quantity beyond the applicable statute of 21 U.S.C. § 841(b)(1)(B)(500 grams of more but less than five kilograms of cocaine) as charged in the indictment, after resentencing failed to challenge on appeal to the imposed sentence based on the reasonableness standard established in **Booker**. **United States v. Ameline**, 409 F.3d 1073, 1085 (9th Cir. 2005).

Accordingly, the petitioner's imposed sentence on the offense charged in the indictment pursuant to 21 U.S.C. § 841(b)(1)(B) must be vacated based on ineffectiveness of counsel during his criminal proceeding from pre-trial to on appeal. As if was not for counsel's errors the sentence would have been different as established in **Strickland** by the Supreme Court.

1. **INEFFECTIVE ASSISTANCE OF COUNSEL
   DURING PRETRIAL**

In this case, petitioner asserts that his trial counsel, Mr. D. Scott Dattan, was ineffective because he failed to inform him of all possible plea options to resolve his criminal case and entitle him to a more favorable sentence. Here, counsel aware that the evidence against his client was overwhelming and counsel's advise to petitioner to proceed to trial and testify on his own behalf admitting the offense charged in the indictment, did not inform petitioner that he could have entered an open guilty plea to the sole count of the indictment, likely entitling him to a three-level reduction for acceptance of responsibility.

When summing up counsel's omission, the district court sentenced petitioner to 235-month sentence of imprisonment. Based upon an offense level of 34 (because of relevant conduct under § 1B1.3 of the Sentencing Guidelines), plus two levels for obstruction of justice resulted on a total base offense level of 36, and criminal history category of III, petitioner's guideline offense level was 235 to 293 months imprisonment. Assuming that petitioner would have received a three-level reduction for acceptance of responsibility, he would have been subject to a guideline range of 168 to 210 months (under level 33 and a criminal history category III).

Because petitioner was actually sentenced to 235 months imprisonment, he arguably received a sentence of 25 to 67 months greater than what he would have received had he entered an open plea to the sole count of the indictment. Given that the sentencing court originally chose the bottom of the guidelines range, it is probably that petitioner would have received a sentence lower than 235 month sentence impose. See **Hoffman**, 455 F.3d at 942 (We hold that there is a "reasonable probability" that the outcome of the proceedings would have been different had counsel acted competently); see also **United States v. Booth,** 432

13

F.3d 542, 547 (3rd Cir. 2005)(given that defense attorney's alleged failure to inform defendant of option of open plea to both charges potentially met both deficiency and prejudice prongs of ineffective assistance test)(citation omitted).

Thus, petitioner has demonstrated a substantial likelihood that his counsel's ineffective assistance performance prejudiced the outcome of his sentencing. Having received ineffective assistance of counsel in violation of the Sixth Amendment, and having met both of **Strickland**'s prongs, petitioner is entitled to habeas relief.

### 2.    INEFFECTIVE ASSISTANCE OF COUNSEL DURING SENTENCING

The crux of petitioner's claim for issuance of a writ of habeas corpus is that at his sentencing the prosecution introduced into evidence a proffered statements made by petitioner on March 16 & 17 of 1994 of additional drug amounts of cocaine to enhance the sentence which was allegedly made by him after he had entered a guilty plea, outside the presence of his retained counsel Mr. Scotti, without his having waived the right to counsel, nor obtained permission first from his retained counsel before the said interviews.    On this basis, counsel for petitioner at sentencing, Mr. Mitchel J. Schapira, was ineffective in failing to challenge the introduced statements made by petitioner to increase his sentence based on drug amounts which were elicited in violation of petitioner's Sixth Amendment right to counsel.

Here, there is little evidence presented by the Government at sentencing indicating that petitioner waived his right to have his retained counsel present when he made the statements to Special Agent Henderson. During sentencing the Government's allegation—and adopted by the district court when it reaches its decision on August 29, 2002, that the petitioner's counsel appears to have permitted the conversation between the petitioner and Special Agent Henderson

14

to go on unimpeded in no way constitutes a waiver on the part of petitioner. The theory that since the petitioner made the alleged statements outside the presence of his counsel and that therefore must have somewhere or somehow waived his right to counsel is invalid. Petitioner's former counsel Mr. Scotti testified as follows during petitioner's sentencing hearing on July 26, 2002:

Q.   Okay. And so when the meeting broke up, you did what, left the building, right?

A.   I left the building with Mr. Moreno.

Q.   Okay, and that point, had you given to the government, or to the FBI, or to the U.S. Attorneys Office, permission to contact Mr. Moreno directly?

A.   No. sir.

Q.   And, very briefly now, why not?

A.   That's not my practice. I would have never done that. I would have nev -- especially under those circumstances. I wouldn't do it under the best circumstances if it had gone smoothly. But certainly not under those, those circumstances. The relationship was hostile between the government and him. I would be bordering on malpractice to have allowed that.

[Tr. Sent-1, p. 172]

The facts, as presented lend no credence to any of the Government's theories. They simply show that petitioner never waived the presence of his counsel to be present at the meeting on March 16 & 17, 1994, where he made the alleged incriminating statements. Additional, they disclose that petitioner never signed a waiver form, never repeated the statements in the presence of anyone else, and even subsequently denied having ever made the admission. At the time that petitioner made the alleged statements, Special Agent Henderson knew that petitioner was represented by Mr. Scotti as he was present in the first meeting and counsel was easy to be contacted. But no attempt was made to get petitioner to either repeat the statements in the presence of his counsel or to sign a waiver

15

of counsel.  These facts taken together, not only indicate that the statements were not "volunteered" but lead one in the opposite direction.  In sum, petitioner's statements were not spontaneous and unsolicited.  It was actively sought after by Special Agent Henderson.

Similarly, in **Massiah v. United States**, 84 S.Ct. 1199 (1964), the use of an undercover agent to elicit further incriminating information from a man after he has been indicted and is represented by counsel was forbidden.  In **Massiah** the defendant was indicted for violating the federal narcotics laws.  He retained legal counsel, pleaded not guilty, and was subsequently released on bail.  At or about the same time, a similar charged individual named Colson decided to cooperate with the government agents in their investigation.  Agreeing to the placement of a listening device under the front seat of his car, he ultimately engaged the defendant in a lengthy conversation while sitting in his automobile.  Statements made were picked up by a receiving device from which another agent could hear all that said.

The Supreme Court in reversing the defendant's conviction, stated:

> "Here we deal * * * with a federal case, where the specific guarantee of the Sixth Amendment directly applies.  **Johnson v. Zerbst**, 304 U.S. 458 [58 S.Ct. 1019, 82 L.Ed. 1461].  We hold that the petitioner was denied the basic protections of that guarantee when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of counsel.

84 S.Ct. at 1203.  In this writing, the Government had the right, and indeed the duty, to continue its investigation of the crime subsequent to petitioner's arrest.  It could not, on the other hand, procure or entice a confession from after he had exercised his right to counsel.  Once counsel had been retained, any attempts by the government or their agents to elicit information from petitioner were prohibit, and any incriminating admissions obtained by them could not be used at trial nor

at sentencing.  This is not to say that petitioner could not have made a clear and explicit waiver of the right to have his counsel present or that he could not have voluntarily inititated a spontaneous and unsolicited confession on his own on March 16 & 17 of 1994 as part of the plea agreement.

Here, such facts were not shown.  The Government during sentencing admitted that the alleged confession was made in response to a statement that since petitioner was on bail as part of the plea agreement he should tell the truth or he could be "hurt" by it.

Q.  Mr. Schapira:  Okay.  Okay.  And at that time you didn't entertain any notions about yanking the deal, if I may?

A.  Ms. Henderson:  No, we would not have done that until we were completely done with the interviews.

Q.  Okay.

A.  That would -- that would not have been a fair thing to do.

Q.  Okay.  Wel, if on 3/14 if he had said, To check with you, I already got change of plea, and the deal's in the record, and all I know is that I was in a monastery all of this time," you would say, "That's not going to cut it.  Mr. Burgess, let's proceed," right?

A.  I think we did that on March 17th, yes.

[Tr. Sent-1, p. 89]

While this interviews that occurred on March 16 & 17 might not have been an "interrogation" in the strictest sense of the word, it is clear that the purpose of the interviews and subsequent statements were to elicit a response from petitioner.  Under the reading of **Massiah** and **Escobedo v. Illinois**, 84 S.Ct. 1758 (1964), admission of any statements made by the petitioner in the course of the said interviews with Special Agent Henderson should have been excluded by the trial court at sentencing if had counsel been diligent and raise the proper objection based on violation of petitioner's Sixth Amendment right to counsel.

Had counsel raised a constitutional objection of the Sixth Amendment right

17

to counsel to the admission of petitioner's proffered confession that occurred on March 16 & 17 of 1994, and that on the basis of **Massiah**, supra, its admission to enhance petitioner's sentence based on drug quatity clearly violated his constitutional rights. All is that petitioner's own incriminating statements, obtained by Special Agent Ms. Henderson under the circumstances here disclosed, could not constitutionally be used by the prosecution as evidence against him at his sentencing hearing had his counsel raised the proper objection based on Sixth Amendment right to counsel those statements made by him on March 16 & 17, of 1994 should have been excluded.

Despite a strong presumption that counsel's performance was reasonable, **Strickland**, 466 U.S. at 689, that presumption is overcome here. The conclusion that counsel's performance was ineffective is not based on hindsight. The decisions of **Massiah** and **Escobedo** were readily available to him. Nor can any considered sound strategy be discerned for failing to raise the Sixth Amendment right to counsel violation at the interviews executed by Special Agent Ms. Henderson issue. If all of the drugs added during sentencing due of petitioner's March 16 & 17 confession should not constitute relevant conduct when he was sentenced for conspiracy to possess with intent to distribute in excess of 500 grams but less than 5 kilograms of cocaine, petitioner suffered prejudice.

Here, without the quantity of drugs that were used as relevant conduct of March 16 & 17 interviews, petitioner should only be responsible for the four kilograms of cocaine he confessed in presence of his counsel. The four kilograms of cocaine would have plced him in a sentencing range substantially below 235 months imprisonment he actually received it. Under these circumstances, there is a reasonable probability that petitioner would have been sentenced at base offense level of 30, plus two levels for obstruction of justice would have resulted an offense level of 32, and a criminal history category of III, petitioner's guideline

range of 151-188 months. Given that the sentencing court originallt chose the bottom of the guidelines range, it is likely that petitioner would have received a sentence lower than the 235 months sentence imposed.

Indeed, petitioner has demonstrated a substantial likelihood that his counsel's ineffective performance prejudiced the outcome of his sentencing. Having received ineffective assistance of counsel in violation of the Sixth Amendment, as he has met both prongs of **Strickland's** test, petitioner is entitled to habeas relief.

3.    **INEFFECTIVE ASSISTANCE OF COUNSEL IN FAILING TO CHALLENGE DRUG QUANTITY UNDER "APPRENDI"**

Consequently, petitioner submits that his counsel, Mr. Schapira, rendered ineffective assistance when he failed to object at sentencing to the calculation of his base offense level based on drug quantity beyond level 30 according to the statutory drug quantity pursuant to § 21 U.S.C. § 841(b)(1)(B)(500 grams or more but less than 5 kilograms of cocaine, constituted ineffective assistance of counsel, that prejudice him at sentencing. See **United States v. Velasco-Heredia,** 319 F.3d 1080, 1086 (9th Cir. 2003)(determination of higher quantity of drugs under preponderance standard violated **Apprendi,** since finding raised potential maximum sentence)(citation omitted).

In petitioner's case, the jury found that the offense involved 500 grams or more, but less than five kilograms of cocaine. [Exhibit C] Under 21 U.S.C. § 841(b)(1)(B), petitioner faced a potential sentence of 5 to 40 years when the statutory drug quantity involves 500 grams or more but less than 5 kilograms of cocaine. See **Velasco-Heredia,** 319 F.3d at 1084; see also generally **United States v. Gonzalez,** 420 F.3d 111 (2nd Cir. 2005). Here, with the district judge's factual findings, petitioner faced a base offense level of 34 pursuant to 21 U.S.C. § 841(b)(1)(A)(10 years mandatory minimum if the offense involves 5 kilograms or mora of cocaine). Soley on the basis of the jury's verdict of 500 grams or more

but less than 5 kilograms of cocaine, his base offense level would have been the maximum level of 30, and two points upward for obstruction of justice for a total base offense level of 32, and Criminal History Category of III would have resulted on a sentencing range of 151 to 188 months imprisonment.

Under these circumstances, the drug quantity and type determinations are the "functional equivalent[s] of an element of a greater offense," because they are facts that the potential to increase the statutory maximum sentence. See **Velasco-Heredia**, 319 F.3d at 1084, quoting **Apprendi v. New Jersey,** 530 U.S. at 494 n. 19. For purposes of **Apprendi,** then, these facts must be submitted to the jury, as was done here but only to the statutory drug quantity of § 841(b)(1)(B)(500 grams or more but less than 5 kilograms of cocaine). [Exhibit A] Because petitioner was sentenced under § 841(b)(1)(A)(5 kilograms or more of cocaine), rather than § 841(b)(1)(B), he received a sentence of 235 months imprisonment. Otherwise, he would have received a sentence between 151 to 188 months imprisonment. This error was harmful. See **United States v. Peralta-Romero,** 83 Fed.Appx. 872, 874 (9th Cir. 2003). [Exhibit D]

To support a claim of ineffective assistance of counsel, petitioner must demonstrate that his trial counsel "fell below an objective standard of reasonableness," and that he was prejudiced by counsel's deficient acts or omissions. **Strickland,** 466 U.S. at 687-90. Based on the record before, petitioner has satisfied both of these elements. First, trial counsel's representation in petitioner's case fell below the "range of competence demanded of attorneys" when he failed at sentencing to challenge the PSR's and court's computation offense based on statutory drug quantity as established by Congress pursuant to § 841(b)(1)(B). **Velasco-Heredia,** 319 F.3d at 1086.

The applicable drug statute (21 U.S.C. § 841(b)(1)(A)) provides for a mandatory minimum sentence of 10 years and maximum life if the offense involves

5 kilograms or more of cocaine. The statute in the next subsection (§ 841(b)(1)(B) provides for a lower mandatory minimum of 5 years and maximum of 40 years if the offense involves 500 grams or more but less than 5 kilograms of cocaine. As such, the next subsection (§ 841(b)(1)(C)) does not provide any mandatory minimum sentence under the same circumstances if the amount proved is less than the drug quantities listed in the two preceding subsections.

Here, where petitioner was found guilty by a jury of conspiracy to possess with the intent to distribute 500 grams or more but less than 5 kilograms of cocaine pursuant to § 841(b)(1)(B) as charged in the indictment, [Exhibit C], counsel plainly should have objected that petitioner's offense level was squarely covered by the amount established under § 841(b)(1)(B) and it would have been properly calculated at 30—based on the drug quantity of the March 14, 1994 interview—which corresponds to offenses involving 500 grams or more but less than 5 kilograms of cocaine. See **Peralta-Romero**, 83 Fed.Appx. at 872, quoting **Velasco-Heredia**, 319 F.3d at 1085. In the words of Judge Easterbrook, an objection on this ground was close to "a dead-bang winner." **Page v. United States**, 884 F.2d 300, 301 (7th Cir. 1989).

Based on the court's records, the "reasonable probability" is that petitioner's offense level would have been set at 30, and that he would have been sentenced to a period of incarceration less than 235 months. To cinch matters, without the improper drug calculation pursuant to § 841(b)(1)(A), petitioner's offense level would have been reduced from 36 to 32—including the upward departure for obstruction of justice—and his guideline range from 235-293 months to 151-188 months. Petitioner was sentenced to 235 months—forty-seven months longer than the maximum permissible guideline sentence had the drug statutory quantity have been applied properly.

Therefore, the alleged error here did result in a specific, demonstrable

21

increase in sentencing, and petitioner suffered prejudice because of it. Cf. **Glover v. United States**, 531 U.S. 198, 203 (2001)(holding that "any [increase in the] amount of actual jail time" due to Sentencing Guideline error, constitutes prejudice under the **Strickland** doctrine). Accordingly, defense counsel's failure to object to a drug statutory quantity calculation error that likely resulted in an increase in petitioner's period of incarceration constituted ineffective assistance of counsel. See **Spearman v. United States**, 860 F.Supp. 1234, 1244-46 (E.D. Mich. 1994).

## 4. INEFFECTIVE ASSISTANCE ON APPEAL IN FAILING TO CHALLENGE PETITIONER'S SENTENCE BASED ON THE "REASONABLENESS"

The substance of petitioner's claim is that his appellate counsel, Hugh W. Fleischer, after resentencing was constitutionally ineffective in failing to raise the Ninth Circuit's decision in **Ameline** on appeal and to challenge petitioner's sentence for reasonableness as mandated in the Court opinion. See **Ameline**, 409 F.3d at 1085. At the time of petitioner's appeal, the Ninth Circuit did not review petitioner's sentence for "unreasonableness" after the sentencing court imposed the same sentence due of counsel's of having counsel "failed" to preserve this issue on appeal.

There are only two possible causes for counsel's inaction: (1) Appellate counsel was not aware of **Ameline**: or (2) he was aware of Ameline and chose not to raise it. Regarding the first possibility, if Mr. Fleischer did not conduct sufficient research regarding the district court's misapplication of the Guidelines which led petitioner's sentence "unreasonable" to determine that petitioner had an indisputable legal defense to the sentence thereunder, Mr. Fleischer did not function at the minimum standards required by the Sixth Amendment. See **Strickland**, 406 U.S. at 688 (noting that Sixth Amendment relies on legal profession to ensure that counsel "fulfill the role in the adversary process that

the Amendment envisions"); see also **Fagan v. Washington,** 942 F.2d 1155, 1157 (7th Cir. 1991)("No tactical reason ... other than oversight or incompetence ... can be assigned for the lawyer's failure to raise the only substantial claims that Fagan had."); cf. **Wiggins v. Smith,** 123 S.Ct. 2527, 2538 (2003)(reversing denial of ineffective assistance of counsel claim where counsel's failure to conduct factual investigation of client's case was "objectively unreasonable").

In other words, if appellate counsel was unaware of a clear and indisputable legal defense of petitioner's imposed sentence based on misapplication of the Sentencing Guidelines upon base offense level for drug quantity of 21 U.S.C. § 841(b)(1)(B), counsel did not perform the service required of him by the adversarial process. See **Strickland,** 466 U.S. at 688. Nonetheless, counsel cannot be deemed ineffective, if his actions, while ultimately unsuccessful, were part of a "sound trial strategy." Id. at 689. Thus, the sentencing court must consider the possibility that appellate counsel was aware of **Ameline** (the defendant and the government have the right to appeal to this court [after resentencing] the district court's decision, including a challenge to the sentence based on the reasonableness standard established in **Booker,** yet made a strategic decision not to raise it.

In light of the arguments actually made by counsel on appeal, it seems clear that Mr. Fleischer failed to research the Ninth Circuit's law, and thus there is no rational basis upon which he might have chosen to omit **Ameline** and **Booker,** which was a far stronger argument leading to his desire result, namely the unreasonableness of petitioner's sentence for the district court's miscalculation of the new era of Advisory Sentencing Guidelines. See **United States v. Cook,** 45 F.3d 388, 395 (10th Cir. 1995)("[A]n appellate advocate may deliver deficient performance ... by omitting a 'dead-bang winner,' even though counsel may have presented strong but unsuccessful claims on appeal."); **Mayo v. Henderson,** 13

F.3d 528, 533 (2d Cir. 1994)("[A] petitioner may establish constitutionally inadequate performance if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significant weaker."). Accordingly, the decision to omit **Ameline** and **Booker**—if this was indeed a conscious decision—was not made as part of a reasonable legal strategy pursued by appellate counsel, and the ineffective prong of **Strickland** is therefore satisfied.

As noted previously, in order to obtain relief petitioner must show that the ineffectiveness of his counsel "undermine[d] confidence in the outcome" of his trial. **Strickland,** 466 U.S. at 694. In this case, the alleged prejudice is that if counsel had raised **Ameline/Booker** unreasonableness of sentence on appeal, the Ninth Circuit would have vacated petitioner's 235 month sentence due that was erroneously calculated under the Advisory Sentencing Guidelines. See **United States v. Cantrell,** 433 F.3d 1269, 1280 (9th Cir. 2006)(if there was material error in the Guidelines calculation that serves as the stating point for the district court's sentencing decision, we will remand for resentencing pursuant to 18 U.S.C. § 3742(f), without reaching the question of whether the sentence as a whole is reasonable in light of § 3553(a)). This, petitioner maintains, would have led the Ninth Circuit to determine that in light of the drug quantity of the offense charged in the indictment pursuant to § 841(b)(1)(B) the relevant conduct under § 1B1.3 beyond 5 kilograms of cocaine, petitioner's sentencing hearing was so infused with prejudicial and irrelevant drug amounts that a new sentencing hearing was waaranted

Here, the district court attributted 26 kilograms of cocaine by preponderance of the evidence to calculate petitioner's Sentencing Guideline. Thus, the guideline was trumped to level 34, U.S.S.G. § 2D1.1(3). Petitioner was convicted of 500 grams or more but less than 5 kilograms of cocaine, Exhibit C, after the jury heard a substantial amount of evidence relating of two kilograms of cocaine that

24

petitioner was involved in the conspiracy as testified by Ms. Arizmendy and also his own admission in front of the jury. It is difficult to believe that this evidence did not influence the jury regarding its verdict of 500 grams or more but less than 5 kilograms, Exhibit C, especially given that the offense charged in the indictment made specific reference of § 841(b)(1)(B) as petitioner engaging in illegal drug activities.

Thus, it "undermines confidence in the outcome" of the sentencing to know that the drug quantity beyond 5 kilograms of cocaine as found by the district court by preponderance of the evidence was based pursuant to § 841(b)(1)(A) would likely have been vacated on appeal if petitioner's counsel had not been ineffective, and that there is a reasonable probability that the Ninth Circuit would have remanded the case for resentencing based only for the statutory drug quantity pursuant to § 841(b)(1)(B) in accordance to the jury's verdict.

Accordingly, petitioner was prejudiced by his counsel's ineffectiveness, in that "there is a reasonable that, but for counsel's unprofessional errors, the result of the proceeding would have been different." **Strickland**, 466 U.S. at 694. That is, petitioner's base offense level would have been calculated at level 30, plus two points upward departure for obstruction of justice for a total base offense level of 32, and Criminal History Category of III would have resulted on a sentencing range of 151 to 188 months imprisonment. U.S.S.G. § 2D1.1(c)(5).

## CONCLUSION

Based on the foregoing arguments and authorities, the record in this case and the Petition itself, petitioner respectfully urges this Honorable Court to grant him a writ of habeas corpus, or in the alternative to grant an evidentiary hearing to allow him to prove his case.

So prayed.

25

DATED: this 13th day of Sept, 2007, at Taft, California.

Respectfully submitted,

Jamie E. Moreno
Reg. 00809-112
P.O.  Box  7001/A1A
Taft, California 93268

26