FILED

DEC 0 7 1999

UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA
BY _____ Deputy

UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | Case No. A93-0127-CR (HRH) |
| Plaintiff, ) | |
| ) | Anchorage, Alaska |
| vs. ) | Tuesday, October 19, 1999 |
| ) | 8:34 a.m. |
| JAIME MORENO, ) | |
| Defendant. ) | IMPOSITION OF SENTENCE |

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE H. RUSSEL HOLLAND
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:          TIMOTHY BURGESS
                            U.S. Attorney's Office
                            222 West 7th Avenue, #9
                            Anchorage, AK 99513
                            (907) 271-5071

For the Defendant:          WILLIAM BRYSON
                            1015 West 7th Avenue
                            Anchorage, AK 99501
                            (907) 276-8611

For Probation:              ERIC ODEGARD.
                            U.S. Probation Office
                            222 West 7th Avenue, #48
                            Anchorage, AK 99513
                            (907) 271-5492

Court Recorder:             JENNIFER GAMBLE
                            U.S. District Court
                            222 West 7th Avenue, #4
                            Anchorage, AK 99513
                            (907) 271-3259

Transcription Service:      EXECUTARY COURT REPORTING
                            626 Cordova, Suite 104
                            Anchorage, AK 99501
                            (907) 272-4084

Proceedings recorded by electronic sound recording. Transcri
produced by transcription service.

GOVERNMENT
EXHIBIT

1

# TABLE OF CONTENTS

2

3

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---|---|---|---|---|---|
| FOR THE PLAINTIFF: | | | | | |
| Lou Ann Henderson | 10 | 17 | 27 | | |

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Executary Court Reporting**
626 Cordova, Suite 104
Anchorage, AK 99501
Phone:   (907) 272-4084

1          ANCHORAGE, ALASKA - TUESDAY, OCTOBER 19, 1999

2

3          (Call to order of the Court at 8:34 a.m.)

4                  THE CLERK:  All rise.  His Honor the Court, the

5    United States District Court for the District of Alaska is now

6    in session, the Honorable H. Russel Holland presiding.  Please

7    be seated.

8                  THE COURT:  Good morning, ladies and gentlemen.

9                  AGENT HENDERSON:  Morning.

10                 MR. BURGESS:  Morning, Your Honor.

11                 MR. BRYSON:  Good morning.

12                 THE COURT:  We have set at this time Case A93-0127

13   Criminal, United States v. Moreno.  The matter is before us for

14   imposition of sentence.

15                 I have received and reviewed the presentence report

16   prepared by Probation Service.  I'm not aware of any

17   information being withheld from the presentence report pursuant

18   to Rule 32.  I've received and reviewed the government's

19   sentencing memorandum.  I have not received any sentencing

20   memorandum from the defendant.

21                 MR. BRYSON:  Well, Your Honor, I was out of state

22   last week.  I've come in and talked to Mr. Moreno, and Mr.

23   Moreno is -- I guess we're approaching this case in two

24   different directions right now.  I don't think -- I'm -- I

25   guess I'm having some legal problems as far as explaining to

1    him where we are in this case, that this is the imposition of

2    sentence, and it's not defending him.  And I think that he's

3    expressing some concerns that this is -- that he wants to have

4    some sort of a trial on this issue, or a defense, when my

5    review of the case law on the ability to pull a plea under this

6    plea agreement indicates to me that legally that is not an

7    option.

8              THE COURT:  It sure isn't.  It's a Type B plea

9    agreement, and we're --

10             MR. BRYSON:  Right.  I -- and I reviewed that again

11   last night with this concern in mind, but I am a little worried

12   with the concerns that Mr. Moreno has expressed about the

13   situation here because my sense of it was that I had to review

14   the plea agreement and the matters in the presentence report.

15   I've gone through all the discovery on the statements of

16   Echavarria and other witnesses, as well as the agent's notes of

17   the interview of Mr. Moreno, and so, I mean --

18             THE COURT:  Well, let me proceed, and let's see where

19   we are with it when we get to some of the problems.

20             In this case, the defendant pled guilty to a single-

21   count indictment charging a violation of 21 United States Code,

22   § 846, conspiracy to distribute controlled substances.  It is a

23   Type B agreement.  I may or may not have accepted it at the

24   time I took the change of plea.  If I did not accept it, it is

25   accepted at this time for disposition of this case.

1          The presentence report finds that the base offense

2    level in this case should be 34 based upon the quantity of

3    drugs estimated by the Probation Officer.  This involves a

4    combination of cocaine and marijuana, which all of which has

5    been converted to the equivalent amount of marijuana under the

6    guidelines.  The presentence report writer's calculations come

7    up with 3,010 kilos of marijuana, or equivalent of marijuana,

8    which is just over the dividing line between a Level 32 and

9    Level 34.

10          The report finds that there should be a two-level

11    upward adjustment for the presence of a gun.  That is disputed,

12    denied, by the defendant, and I understand the government's not

13    going to present any evidence on the issue.  Is that correct?

14          MR. BURGESS:  That's correct, Your Honor.  In the

15    hopes of narrowing the sentencing issues, we're going to stand

16    on the information in the PSR.

17          THE COURT:  Okay.

18          MR. BURGESS:  And if I could --

19          THE COURT:  And you --

20          MR. BURGESS:  If I may --

21          THE COURT:  You understand that means I'm going to

22    knock the two-level adjustment --

23          MR. BURGESS:  I understand.

24          THE COURT:  -- for a gun out of there.

25          MR. BURGESS:  I understand that.  I anticipated that,

1    and that's my -- the calculations reflected in my sentencing

2    memorandum anticipated that very action, Your Honor.

3              THE COURT:   Without any evidence of the possession of

4    a gun, at this point, I'm going to delete the two-level

5    adjustment for a gun.

6              MR. BURGESS:   That's fine.   I understand.

7              THE COURT:   With respect to some further -- well,

8    there's one further adjustment.   The report would add two

9    levels for obstruction based upon the defendant's flight after

10   the change of plea and at a time a number of years ago when

11   this case was scheduled for sentencing.   That strikes me as an

12   entirely appropriate adjustment.   That would give us an

13   adjusted offense level of 34.   The report declines to grant

14   acceptance of responsibility.   I don't know whether there's any

15   disagreement about that or not, but I'll hear if there is.

16             MR. BRYSON:   I don't think we're in a position to

17   clear that hurdle today, Your Honor.

18             THE COURT:   I don't think you are either.   The

19   guidelines appear to me to be pretty clear that you don't get

20   acceptance of responsibility when you flee from sentencing.

21   That would give us a total offense level of 34 (sic).

22             MR. BURGESS:   Your Honor, if I could ask you one

23   quick question.

24             THE COURT:   Certainly.

25             MR. BURGESS:   In the course of your calculations, I

1   think I missed the base offense level of 32 before you gave the

2   obstruction of justice enhancement.  Was that on -- based on

3   the amount of --

4           THE COURT:  I'm sorry.

5           MR. BURGESS:  I thought it was 34 was the base

6   offense on the amount of drugs, and then two more would make it

7   36.

8           THE COURT:  You're correct.  You're correct.  I added

9   wrong.

10       (Pause)

11          THE COURT:  Base level 34 plus 2 for obstruction, no

12  acceptance of responsibility leads to 36, not 34.  Thank you.

13          With respect to the defendant's criminal history, we

14  have four points based upon prior convictions.  We have two

15  points for being on probation at the time of the subject

16  offense.  We have one point for the subject offense being

17  within two years of release from confinement.  Gives us seven

18  points and a criminal history category of 4.

19          Is there anything that we need to be concerned about

20  with the criminal history calculation, Mr. Burgess?

21          MR. BURGESS:  Not that I'm aware of, Your Honor.

22          MR. BRYSON:  Your Honor, this is the type of case

23  that had the plea agreement not barred me from seeking a

24  downward departure, I might well have indicated that these

25  petty theft offenses unduly aggravate the criminal history.

1    But as I read the plea agreement in this case, we were

2    barred -- which I didn't negotiate -- but we were barred from

3    seeking any downward departures.

4        (Pause)

5            THE COURT:  That's the way I read the plea agreement.

6    I'm going to think about that subject myself a little bit.

7            All right.  Do we have a disagreement that we need to

8    resolve about the quantity of drugs?

9            MR. BRYSON:  I'm not quite certain how the Probation

10   Office or the U.S. Attorney developed that.  I've reviewed Mr.

11   Echavarria, who is an alleged co-conspirator's statement, which

12   I believe is part of the basis for that, and I've also reviewed

13   handwritten notes provided to me, which I believe were either

14   taken by Agent Henderson or another agent during Mr. Moreno's

15   interview.  My addition does not get to 15 kilos from --

16   because it's rather unclear what the admissions are.  At one

17   point, I thought that they were going to call Agent Henderson

18   to clear that up.  It's --

19           THE COURT:  Well, let me suggest to you that when I

20   do it, I get to 2,890.  And if you're interested, which I hope

21   somebody would be, what I've done is taken the amounts of

22   cocaine that are at least somewhat specific.  Now, one kilo,

23   two kilos, you know, one kilo six times and so forth, and what

24   I did was drop out one item where I didn't have any specific

25   number.  There was a 26-kilo transaction but apparently no

8

1    solid information about how much this defendant was involved

2    in.    Converting the specific numbers to the equivalent amount

3    of marijuana, and factoring in the, I think it was 22 pounds of

4    marijuana, I come up with 2,890 kilos of either marijuana or

5    equivalent marijuana.

6            Does the government have a problem with that

7    calculation?

8            MR. BURGESS:    What the government was prepared to,

9    and is still prepared, if the Court so -- is so inclined to put

10   on today -- and what I've tried to emphasize in the sentencing

11   memorandum -- is that I believe that the information Echavarria

12   provided, that the presentence report author is accurate.    But

13   in addition, the numbers I mentioned in our sentencing

14   memorandum include additional cocaine that were not included in

15   the PSR that were admissions by Mr. Moreno in the course of his

16   debriefing.    And I say that by way of not trying to pile on or

17   add on additional cocaine, but I want to point out to the Court

18   that there is more than enough cocaine to support the number

19   already contained in the PSR.

20           THE COURT:    Mm hmm (affirmative).

21           MR. BURGESS:    And that's what I was prepared to put

22   on today, two things.    One is, Special Agent Henderson to

23   ver- -- to allow her to testify about the fact that she did

24   substantiate information provided by Mr. Echavarria and other

25   co-conspirators that was relied upon by the PSR author.    And

1    secondly, Mr. Moreno's own statements, which were not included

2    in the amounts calculated in the PSR, that, again, are more

3    than enough to substantiate the amount arrived at in the PSR.

4    But again, I don't offer that second angle as a means of adding

5    additional cocaine on, just to say that there's more than

6    enough cocaine there to support the number already in the PSR.

7                   THE COURT:  I hear you.  Mr. Bryson?

8                   MR. BRYSON:  Well, I'm having a little trouble

9    going -- you know, Echavarria being a co-conspirator, I sort of

10   viewed that with some degree of caution after Corel (ph), but

11   going through Agent Henderson's notes, it's a little hard to

12   determine what transactions specifically Mr. Moreno was

13   involved in as opposed to describing transactions that he knew

14   about by others.  And so if that is really viewed as an

15   admission against interest, then the stronger of the two proofs

16   here, then I would at least like to have that cleared up.

17                  MR. BURGESS:  And I guess, just in response, Your

18   Honor, when I went over this with Special Agent Henderson, we

19   were identifying transactions that Mr. Moreno was directly

20   involved in, not transactions he knew about when --

21                  THE COURT:  I think we'd better hear what she has to

22   say.

23                  MR. BURGESS:  Thank you, Your Honor.  At this time,

24   I'd call Special Agent Henderson, Your Honor.

25                  THE CLERK:  If you'll come forward to be sworn.

1    SPECIAL AGENT LOU ANN HENDERSON, PLAINTIFF'S WITNESS, SWORN

2              THE WITNESS:  I do.

3              THE CLERK:  If you'll please have a seat at the

4    witness box.  For the record, please state your full name,

5    address, and spell your last name.

6              THE WITNESS:  Lou Ann Henderson, H-e-n-d-e-r-s-o-n,

7    101 East 6th Avenue, Anchorage, Alaska 99501.

8              THE CLERK:  Thank you.

9                         DIRECT EXAMINATION

10   BY MR. BURGESS:

11   Q    Special Agent Henderson, by whom are you employed?

12   A    The Federal Bureau of Investigation, Anchorage.

13   Q    And what are your primary duties with the FBI here in

14   Anchorage?

15   A    My primary duties currently are investigating drug and

16   gang violations, violent crimes.

17   Q    Are you familiar with the defendant seated in the

18   courtroom here today, Mr. Moreno?

19   A    Yes, I am.

20   Q    And how is it you're familiar with Mr. Moreno?

21   A    I was involved in an investigation with him in regards to

22   distribution of cocaine.

23   Q    And approximately when did that investigation start?

24   A    The investigation was back in 1992.

25   Q    All right.  And how was it, just very briefly, you became

1    involved in that investigation?

2    A    Basically involved about 14 individuals distributing

3    kilogram quantities of cocaine from California to Anchorage,

4    Alaska.

5    Q    Now, again, I don't want to have you testify about the

6    entirety of your investigation, but I'd like you to focus for

7    the time being on Mr. Moreno.  What did you learn during the

8    course of your investigation was Mr. Moreno's role in this

9    conspiracy?

10   A    Specifically in regards to the -- the conspiracy itself,

11   which was in January of 1993, I arrested a lady at the

12   Anchorage Airport by the name of Helen Arismendy.  I had a

13   search warrant for her luggage and her person, and I found two

14   kilograms of cocaine in a Tide box, Tide detergent box.

15   Q    And did you have an inter- -- an opportunity to interview

16   Ms. Arismendy?

17   A    Yes, I did.

18   Q    And did Ms. Arismendy have an opportunity to explain to

19   you who Mr. Moreno was?

20   A    Yes, she did.

21   Q    And did she -- and could you please tell the Court what

22   she told you?

23   A    Basically, she had known him for a while.  He was involved

24   with her nephew, Gustavo Velez Montoya (ph), whose -- was at --

25   a major cocaine distributor in the state of California.  The

1    owner of the two kilograms of cocaine that I took from Helen

2    Arismendy came from Mr. Moreno.

3    Q    Okay.  Did Ms. Arismendy have an opportunity to explain

4    how the cocaine distribution conspiracy worked?

5    A    Yes.  I interviewed her on numerous occasions.

6    Q    Okay.  Did you have an opportunity, during the course of

7    your investigation, to verify information she was providing

8    you, or did you take what she told you on face value?

9    A    No, I have to verify everything that --

10   Q    All right.  And how did you --

11   A    -- defendants tell me.

12   Q    -- go about verifying that?

13   A    Hotel records, airline records, business records.  I

14   had -- I'd done a number of search warrants on the co-

15   defendants in this case; search warrant records, such as drug

16   records.  I also verified activities through police reports.

17   If they indicated somebody had been -- a seizure had occurred

18   in the state of California, I would contact detectives down in

19   that specific area and acquire police records on seizures.  Her

20   nephew had, on several occasions, lost around 300 kilograms of

21   cocaine shipments, so -- as a result of seizures by law

22   enforcement, so I would contact the law enforcement officers

23   down there to, in fact, verify that information.

24   Q    Now, when you say "her nephew," you -- that being --

25   what's the name of that person?

1    A    Gustavo Velez Montoya (ph).

2    Q    All right.  And in checking out the information Ms.

3    Arismendy was providing you, were you able to substantiate what

4    she was telling you.

5    A    Yes, again, through all the -- the records that I just

6    indicated.

7    Q    Okay.  Are you familiar with an individual by the name of

8    Mr. Echavarria?

9    A    Yes.

10   Q    Okay.  And who is he?

11   A    Mr. Echavarria is also a co-defendant in this case with --

12   along with Mr. Arango.  They were the middlemen.  When

13   acquiring these two kilograms of cocaine that I -- that I

14   seized from Ms. Arismendy, basically what occurred is her -- at

15   the time, she was dealing with Gustavo Velez's (ph) sister,

16   Martha Velez (ph), another co-conspirator, and -- because

17   Gustavo Velez (ph) was not in the country at that time; he was

18   in Colombia.  So she -- so Mrs. Arismendy had to deal with her

19   niece instead of her nephew, Martha Velez (ph).

20       Martha Velez (ph) put Helen Arismendy in contact with Mr.

21   Echavarria, whose cocaine partner at that time was Mr. Arango,

22   and they were attempting to acquire two kilograms of cocaine,

23   which they did acquire from Mr. Moreno.  And the same

24   information that Ms. Arismendy had given me, in fact, also Mr.

25   Echavarria gave me, and I was able to verify, again, through

HENDERSON - D. _ɔcf                    14

1   hotel records, telephone records, and airline records.

2   Q    You were able to verify what Mr. Echavarria was telling

3   you?

4   A    Yes.

5   Q    All right.  Now, at some point was Mr. Moreno arrested?

6   A    Yes, he was.

7   Q    And did you have an opportunity, at some point, to

8   interview Mr. Moreno?

9   A    Yes.

10  Q    And approximately when was that?  Do you remember?

11  A    It would have been in March of 1994.

12  Q    And do you remember what the circumstances of your

13  interview with Mr. Moreno were -- was?  Was that just after

14  arrest, or was that in conjunction with a plea agreement, or

15  what?

16  A    It was after he entered a plea of guilty in this case, and

17  it was pursuant to a plea agreement.

18  Q    And that plea agreement, is it your understanding,

19  required his cooperation?

20  A    Yes.

21  Q    All right.  Now, during the course of your interview with

22  Mr. Moreno, did you have an opportunity to talk to him about

23  his drug dealing?

24  A    Yes.

25  Q    All right.  And what did he tell you about his drug

1    dealing?

2    A    Oh, we -- we started off with -- basically, I wanted him

3    to tell me how he began in the cocaine business, and we started

4    off in April of 1991, and from April 1991 through May of 1992,

5    he specifically told me about eight kilograms of cocaine that

6    he had sold, and his association was with, again, Gustavo Velez

7    Montoya (ph).  It was based on his relationship with Mr. Velez

8    (ph) that he was able to acquire a lot of cocaine.  It also

9    involved other transactions, like he had -- he was in the

10   process of trying to purchase a car from Mr. Velez (ph).  So it

11   was not just cocaine business, but he also talked about car

12   business.

13        And then after -- after May of 1992, specifically,

14   beginning in August of 1992, he then talked to me about

15   specific transactions, again, that he had with other

16   individuals in this case, to include Mr. Echavarria, and we

17   totaled up approximately 13 kilograms of cocaine.  And also

18   with Mr. Echavarria, he was talking to him about the marijuana,

19   distributing marijuana.  Mr. Echavarria was also getting

20   involved in the distribution of marijuana, and he was able to

21   acquire approximately two pounds of marijuana from Mr.

22   Echavarria in May or -- he recalled May or March of 1993.

23   Q    "He" being Mr. --

24             THE COURT:  That's part of the --

25   A    Mr. Moreno.

1          THE COURT:  That's part of the 13?

2    A    Yes, sir.  It's 13 keys of cocaine, Your Honor, and

3    then -- and two pounds of marijuana.

4    Q    So this is -- I'm sorry -- two pounds of marijuana that he

5    bought from --

6    A    Mr. Echavarria.

7    Q    -- Mr. Echavarria.  Thank you.  How long did you interview

8    Mr. Moreno?

9    A    The interview took place on two days.  I have to look at

10   my notes.  The first date was March 14th, 1994, and then -- I'm

11   sorry.  It was three days -- March 16th and March 17th, and

12   then he fled on March 17th.

13   Q    All right.  And what was the -- Mr. Moreno's demeanor

14   during the time of the interviews?

15   A    It -- it was obvious -- I mean, when I do these

16   interviews, it's -- it's no different -- his interviews were no

17   different than any other person I've interviewed in the past.

18   Initially, they were not -- he was not being completely

19   forthright regarding his cocaine transactions.

20   Q    And did that change during the course of the interviews?

21   A    No.  It -- it did not.  The interview on March 17th was

22   extremely short.  I had, on that date, went to your office to

23   advise you, and at which point, I recall that you received a

24   telephone call from Mr. Moreno, which you put on the -- on the

25   speakerphone, and he advised you that he would not be returning

1    to talk to us.

2              MR. BURGESS:  Thank you.  I have no other questions,

3    Your Honor.

4              THE COURT:  Mr. Bryson?

5                        CROSS-EXAMINATION

6    BY MR. BRYSON:

7    Q    Agent Henderson, were -- was it just you that was

8    interviewing Mr. Moreno, or were there others?

9    A    It was me, and his attorney, Mr. Scotti, was there on at

10   least one or two occasions, and then -- specifically, like

11   right after the plea agreement -- and then Mr. Burgess may have

12   sat in on maybe the first one.

13   Q    And did you have the opportunity in the -- I notice that

14   there are typewritten reports of other witnesses' interviews.

15   All of the Arismendy interviews have been typed out.  The

16   Echavarria interviews have been typed out.  Did anyone prepare

17   either a transcript a typewritten version of Mr. Moreno's

18   interview?

19   A    No.  And as you're aware, we do not record our interviews.

20   Q    I was going to actually get there.  You didn't use a tape

21   recorder in --

22   A    No, sir.

23   Q    -- this interview.  And so basically, the only thing that

24   we have as far as documenting what you say that Mr. Moreno told

25   you is your handwritten notes?

1   A    My original notes, yes.

2   Q    All right.  Now, when you talk about Mr. Moreno's role in

3   the conspiracy, he told you, did he not, as well as Probation,

4   that on the transaction, the two-kilogram transaction that he

5   pled to, that he was just a go-between between a person named

6   Juan Carlos and the people who delivered -- or wanted to get

7   the cocaine from Mrs. Arismendy?

8   A    No.  What he -- he indicated was he -- the -- the

9   middlemen were actually Echavarria and Mr. Arango, and then

10  there was -- they -- they acquired the cocaine from Mr. Moreno.

11  And as always, there is somebody above Mr. Moreno.  I can't

12  tell you what he said to Probation.  I -- I really don't know.

13  Q    Now, Mr. Moreno, though, are you aware that he told them

14  at one point that all he got for this transaction was $500

15  for -- basically for going and getting it from somebody and

16  bringing it to the hotel room where Ms. Arismendy was?

17  A    I'm sorry.  He told -- "they."  I don't know.  Who do you

18  mean?

19  Q    Are you aware -- you haven't reviewed the Probation

20  report.

21  A    No, sir.  I don't have access to that.

22  Q    All right.  Did he ever tell you that all he got was $500

23  for the two-kilogram transaction?

24  A    He -- he complained to me that that's -- he got a small

25  amount of money.

1    Q    And when you were looking at this conspiracy, you were
2    able to sort through, were you not, a lot of different papers
3    involving a lot of different people?

4    A    Yes.  As I previously indicated, there were about 14
5    individuals involved, specifically, that I was able to track to
6    Alaska.  I mean, there -- there was a lot of other individuals
7    involved in the state of California which were not distributing
8    cocaine up here in Alaska, but fourt- -- at least 14
9    individuals I was able to indict or --

10   Q    And the only people that Mr. Moreno really knew or had any
11   history with was Gustavo Velez (ph) and Mr. Echavarria; is that
12   correct?

13   A    No.

14   Q    Which other people do you contend that Mr. Moreno had a
15   relationship with?

16   A    He had a relationship with the head of the organization,
17   which was Gustavo Velez Montoya (ph).  He knew Martha Velez
18   (ph) and had dealings with her, who is the sister and niece of
19   Helen Arismendy -- the sister of Gustavo Velez (ph) and the
20   niece of Helen Arismendy.  He obviously knew Helen Arismendy
21   'cause he met her the -- on the day that the two kilos were
22   transferred.

23   Q    Didn't Ms. Arismendy indicate to you that she did not know
24   who the individual was that brought the cocaine, that he was a
25   Mexican male?

1    A    Yes.  Initially she stated that.

2    Q    And so she didn't give you Mr. Moreno's name.

3    A    No, not at the -- not during the first interview.

4    Q    Now, going through your notes, I have a little trouble

5    adding up where the kilo transactions as -- are and how much of

6    it was Mr. Moreno indicating what Gustavo (ph) was doing as

7    opposed to himself.  Can you clarify that for me somewhat?

8    A    Yes.  April of 1991, Mr. Moreno, which is -- is not --

9    it's not unusual for any -- anyone to be this way -- could not

10   give me specific dates because when you're involved in a number

11   of transactions, it's difficult to remember.  And also, you

12   have to take into account I was interviewing him in 1994, and

13   asking him questions about 1991 up to that present time, 1994.

14        So beginning in April of 1991, he indicated that he

15   purchased one kilogram of cocaine from Gustavo Velez (ph).

16   Approximately one to two weeks later, he purchased another key

17   from Gustavo (ph).  May of 1991, they had a discussion about a

18   black BMW.  As I indicated earlier, they were talking about --

19   Mr. Moreno was involved in the car business, and basically, he

20   was looking at a black -- they were discussing a black BMW.  He

21   initially was going to sell the BMW to Gustavo (ph) for one

22   kilogram of cocaine.  And again, I did not count that because

23   later on, the car was returned and there was agreements worked

24   out where there was going to be payment back.  So I did not

25   count that kilogram of cocaine.

1        August 9th of 1991, he remembered that specific date.  He

2   ordered two kilograms of cocaine from Gustavo Velez (ph), and

3   it was delivered by Mr. Velez's (ph) sister, Martha Velez (ph).

4   The fall of 1991, he purchased two kilograms of cocaine, again

5   from the Velez (ph) family, Martha and Gustavo Velez (ph).  And

6   then he remembered in late 1991, Gustavo Velez's (ph) mother

7   was ill -- and I confirmed that through other relatives -- and

8   he needed some money -- Mr. Velez (ph) needed some money.  He

9   offered two kilograms of cocaine to the defendant, Mr. Moreno,

10  and -- but Mr. Moreno only took one of the kilograms of

11  cocaine.

12       They were having problems at that point in time.  Mr.

13  Moreno indicated to me that he did not care for the quality of

14  cocaine that Mr. Velez (ph) was actually selling.  So there was

15  a lot of disagreement there.

16       And then he recalled in May of 1992, at Sam's U-Haul,

17  which was -- at Sam's U-Haul, another co-defendant was working

18  there; Gorge Jiminez (ph) was working there.  He is a -- was a

19  cocaine partner with Gustavo Velez (ph).  And Mr. Moreno went

20  to Sam's U-Haul in California and purchased one kilogram of

21  cocaine from Mr. Gustavo Velez's (ph) partner, Gorge Jiminez

22  (ph).

23       Then beginning in August of 1992, he recalled

24  approximately purchasing six to nine ounces of cocaine.  Again,

25  now, at this point in time is when he's talking to -- to me

1    about other people that he purchased the cocaine from:  Mr.

2    Echavarria -- (clearing throat) excuse me -- Mr. Jiminez (ph),

3    because Mr. Velez (ph), Gustavo Velez (ph), was having some

4    problems in his cocaine business, along with some personal

5    problems with his mother being -- at this point, she had passed

6    away.

7         Also, he recalled from August of '92 -- it was either in

8    August of '92 or September of 1992, he purchased one kilogram

9    of cocaine, and he recalled that the price at that point in

10   time was either -- was around 14,500 to 15,000.  In September

11   of 1992 to November of 1992, on four to seven occasions, he

12   sold -- or purchased and then sold one kilogram of cocaine.

13   However, on one of those occasions, it was actually two

14   kilograms.

15   Q    Now, this is all coming from Mr. Moreno during his

16   debriefing?

17   A    Yes, sir.  That's -- that's what I'm talking about now --

18   Q    Right.

19   A    -- specifically that.  Then the next occasion would be he

20   did not know there was another kilogram involved.  He did not

21   know when it occurred after November of 1992.  Then we come up

22   to January, specifically, January 23rd of 1993, which is the

23   two kilograms that are part of this case, the conspiracy which

24   we're here about.  Then after that occurred, from -- he -- he

25   recalled from February of 1993 to April of 1993, he recalled

1   another two kilograms of cocaine that he had purchased and

2   sold.  And again, at this point in time, he's dealing, as I

3   indicated before, with Mr. Echavarria.

4       And then also during that time period, specifically,

5   again, February 1993, and he recalled March 1993, is when he

6   purchased two pounds of marijuana from Mr. Echavarria.  He

7   recalled that it was like $500 per pound, which would have been

8   a total of $1,000 for those two pounds.  Mr. Echavarria, at

9   that point in time, had a lot of marijuana and was trying to

10  unload it through --

11  Q   Sounds to me --

12  A   -- customers.

13  Q   -- like you checked out the things that Mr. Moreno was

14  telling you and found them to be valid?

15  A   I -- as I indicated before, Mr. Bryson, in interviewing

16  these individuals initially, they tend to minimize their

17  activity.

18  Q   But at some po- --

19  A   I believe -- I believe that Mr. Moreno was involved in

20  more transactions with Mr. Echavarria than what he's telling

21  us.

22  Q   At some point, though, it sounds like you're relying on

23  specific dates and times and quantities that he gave you during

24  the debriefing.

25  A   Yes, in order to narrow down the times.  I -- I asked him

1    to narrow down specifically, you know, dates that he could, and

2    we had to go with months and years, which is not unusual

3    because we're talking about, you know, two to three years ago,

4    at that point in time, which was, you know, March of 1994.

5    Q    I guess what I don't understand is when going through this

6    in the considerable detail and him telling you about all these

7    transactions, is why his debriefing didn't give him credit

8    pursuant to his plea agreement.  I mean, it sounds like he got

9    it all off his chest and told you about the transactions.

10   A    These are in addition to what's in the presentence report.

11   He didn't -- none of this was taken into consideration.

12   Q    Well, the presentence report specifically relies on Mr.

13   Echavarria's comments; correct?

14   A    Correct.  And I'm relying on Mr. Moreno's, which his --

15   his involvement is with Mr. Moreno, Ms. -- or, I'm sorry -- Mr.

16   Gustavo Velez Montoya (ph), Martha Velez (ph), Helen Arismendy,

17   and also Mr. Echavarria.

18   Q    All right.  The only thing that you got from Ms. Arismendy

19   was the two-kilogram transaction at the hotel room; correct?

20   A    She -- yes.  She talked to me --

21   Q    With Mr. Moreno.

22   A    -- about that.  Yes.

23   Q    And so everything else, then, either comes from Mr.

24   Echavarria, who is a co-conspirator, or from Mr. Moreno

25   himself?

1    A    Yes.

2    Q    And --

3    A    Well, no.  No, no, no.  No.

4    Q    Oh.

5    A    Mr. Arango also.  I interviewed Mr. Arango, another co-

6    defendant in this case.  He was present for the two kilograms

7    that -- on March -- or, I'm sorry -- on January 23rd of 1993.

8    Q    Right.  That was the two kilograms of the count --

9    A    Yes.

10   Q    -- to which he pled.

11   A    Yes, sir.

12   Q    All right.  And so all this other quantity basically

13   either came from a co-conspirator who was trying to get a

14   better sentence, or it came from Mr. Moreno in three days of

15   interviews with you.

16   A    What I just testified to came from Mr. Moreno.  This is my

17   discussions with Mr. Moreno, what I just talked about, sir.

18   Q    All right.  And the only record we have of these, then, is

19   your notes?  You sound -- you seem to be testifying in a little

20   more detail than I can find in your notes.  Do you have any

21   other record of this?

22   A    No, sir.  That's from my notes.

23   Q    Okay.

24        MR. BRYSON:  Just a moment, Your Honor.

25        (Pause - Whispered consultation)

1   Q    Are you familiar with the circumstances under which Mr.

2   Moreno was arrested after he had been in Mexico?

3   A    Some of them, not -- not -- I was not there, so --

4   Q    Did -- was there another charging document naming Mr.

5   Velez (ph) and Mr. Moreno that was used to execute his arrest?

6   A    No.

7   Q    And --

8   A    Mr. Velez (ph) is not living, sir.

9   Q    Right.  I understand that, and Mr. Moreno indicates that

10  there was a piece of paper when he was arrested naming Velez

11  (ph) and Moreno and indicating that Velez (ph) was deceased.

12  You don't know of any document such as that?

13  A    No.  Mr. Moreno (sic) was never indicted in this case, and

14  he was murdered approximately one month after I arrested his

15  aunt in Colombia.

16  Q    And so when Mr. Moreno was taken into custody when he came

17  into the United -- or when he was deported from Mexico, that

18  was on the basis of an outstanding warrant?

19  A    It would have been a warrant that was issued by this Court

20  for failure to appear.

21  Q    Okay.

22       (Pause - Side comment)

23       MR. BRYSON:  I have no further questions of Agent

24  Henderson.

25       THE COURT:  Mr. Burgess, anything further?

1                        REDIRECT EXAMINATION

2    BY MR. BURGESS:

3    Q    Special Agent Henderson, just one question.  I believe you

4    had not finished sort of a list of specific dates.  You stopped

5    in the February/March time range of '93 with the two pounds of

6    marijuana.  Were there any other transactions he told you about

7    after the two pounds of marijuana, specifically by date?

8    A    Well, I had indicated -- I -- I might have taken it out of

9    order -- February of '93 to April '93, there were two

10   kilograms.

11   Q    Okay.  Thank you.

12            MR. BURGESS:  No other questions, Your Honor.

13            THE COURT:  Thank you, ma'am.  You may step down.

14        (Witness excused)

15        (Pause - Side comment)

16            THE COURT:  Anything else the government wants to

17   offer on the amount of drugs?  Mr. Bryson --

18            MR. BURGESS:  No, sir.

19            THE COURT:  -- anything from you?

20            MR. BRYSON:  Your Honor, my client has asked me all

21   morning that he wants to go on.  I advised him to not do so.  I

22   suppose it's his right, but I think it might be --

23        (Side comment - Pause)

24            MR. BRYSON:  I've -- I'm in a position where I don't

25   believe that he should take the stand, and I believe that, at

1    this point, he disagrees with the agent and wishes to.  I'm put

2    in sort of an awkward position.

3             THE COURT:  Well, there's perhaps a mid ground here

4    in that as a part of the sentencing proceeding, I always ask

5    the defendant if he has something that he wants to say from the

6    defendant's chair.  And I'm going to --

7             MR. BRYSON:  Right.  And perhaps --

8             THE COURT:  I'm going to do that.

9             MR. BRYSON:  All right.

10            THE COURT:  And if anybody or everybody wishes, I'm

11   prepared to do that before I make a decision on --

12            MR. BRYSON:  I think --

13            THE COURT:  -- this.

14            MR. BRYSON:  -- that we've had this discussion

15   several times, and I don't seem to -- I think that there are

16   some things that he wishes to say that I don't think might

17   necessarily help us here, but that's his right.

18            THE COURT:  Well, and I'm going to offer him that.

19   Before you sit down, Mr. Bryson, I didn't ask you something

20   that I usually ask, and I think I know the answer, but I want

21   to be clear on it.  You've reviewed this presentence report

22   thoroughly.

23            MR. BRYSON:  I have.

24            THE COURT:  And you've discussed it with --

25            MR. BRYSON:  I -- I've --

1          THE COURT:  -- your client.

2          MR. BRYSON:  -- discussed it with him.  He -- he's

3    upset by some of the allegations in it, and he's upset by some

4    of the -- I mean, principally, he's upset by the severity of

5    the sentence in light of his plea agreement.

6          THE COURT:  I understand.  But the point here is that

7    you and he have reviewed the presentence report.

8          MR. BRYSON:  Yes.  I have told him how they get to

9    the quantities.

10          THE COURT:  All right.  Is there anything else we

11    should do before I hear from Mr. Moreno?

12          MR. BURGESS:  No, sir.

13          THE COURT:  Mr. Moreno, is there anything you want to

14    tell me before I impose sentence in this case?

15          THE DEFENDANT:  Well, Your Honor, I --

16          THE COURT:  And if you wish, you may remain seated.

17          THE DEFENDANT:  Oh, okay.

18          THE COURT:  You will record better if you're --

19          THE DEFENDANT:  Okay.

20          THE COURT:  -- seated, actually.

21          THE DEFENDANT:  You know, I would like to -- Your

22    Honor, I need an -- you know, would like to have an extension

23    to present the -- the defense because I haven't even review

24    my -- my discovery.  I haven't -- haven't seen my discovery.

25    So how can I go on to be sentenced, you know, when this is the

1   rest of my life in prison, the way -- they way they're adding

2   up all these kilos that I don't think -- I don't think has any

3   grounds, any proof.

4        And also, I tried to help the government.  They --

5   she -- she didn't have to -- I mean, you guys didn't have to

6   look for me.  I called the FBI agents in Tucson, Arizona, in

7   1997.  And that's how -- that's how you guys found me, because

8   I gave you -- I gave you guys my personal phone number.  And

9   when I got arrested, I was supposed to be doing an undercover

10  work for -- for United States government.  That's -- that's how

11  I went to pick up the agent, supposed to be the agent, that I

12  have his phone number here, and name, at the airport.  I was

13  supposed to be doing something for you guys to get my original

14  sentence back, and probably some time off.  And that's how you

15  guys got me at the airport.

16       And at the airport, when I got arrested, the Mexican

17  people and them agents showed a different indictment, which

18  it -- it said Gustavo Velez (ph), deceased; Jaime Moreno, el

19  loco -- the crazy man -- versus United States of America.  They

20  showed me that discovery.  And -- and I said, 'But I'm supposed

21  to be helping you guys to -- to catch these two other guys,

22  these two Colombian -- Colombian people, supposedly.'  And I

23  said, 'All I want is to go back to -- and give the country back

24  to my two daughters and my wife.'

25       And so I haven't really -- you know, as -- as -- as I

1    understand, I tried to help, and this is what I get back.  You

2    know, instead of the eight years that I signed for, now I'm

3    looking at the rest of my life in prison.  And I did help.  I

4    put -- I -- I told the truth, nothing but the truth.  Everybody

5    took a deal on this case, and the other person that I talked

6    to, he got -- he got 20 years, you know, in prison.  So

7    where -- where did I lie?  I mean, whe- -- you know?

8            And this guy, Echavarria, he's -- he's -- he's not

9    telling you the truth.  He's telling things so he can enhance

10   my time and he can get home free sooner than me.

11           So, you know, I -- I think, you know, why should we

12   rush into sentencing me if -- if I haven't really presented a

13   defense?  I don't really even know -- I haven't even seen my

14   discovery.  I haven't had the chance to really talk to Mr.

15   Bryson about everything.

16           You know, it's -- I signed up for eight years.  Even

17   if I fled, it's another 18 months.  That's -- that's 10 years,

18   but not 27.  You know, she didn't have the discovery back in

19   '93.  Why does she have -- come up with it right now?  You

20   know, they got arrested way before me.  I was out on bail.  I

21   came here to even help the government.  How come she didn't

22   have these -- this discoveries, this other kilos, all these

23   reports back in '93?

24           I understand I left because she tried to -- she -- I

25   never lied.  What happened was, this 24-year-old prosecutor,

1    that it wasn't even him, stood up and said, 'You know what?

2    They're going to tear him apart if he takes the stand.' And

3    then another one said, 'Well, we'll train him.' You know? I

4    mean, this is after three days they told me that, that they

5    were going to tear me apart if I take the stand, 'cause I was

6    nervous. I had -- I didn't have my -- my attorney with me. My

7    attorney left me with them. I didn't know how to act. You

8    know. So then they told me, 'They're going to tear him apart,'

9    you know, 'We can't use him' after three days that I told --

10    that I spilled my guts out.

11         And I think, you know, I think I should have some --

12    some kind of credit, merits, for everything I told them because

13    everybody took a deal. And the person that went to trial, he

14    got 20 years. And I helped them to put that man away.

15         And about Gustavo Velez (ph) that's she's putting all

16    this in writing, he was already dead. The only thing she told

17    me was, 'Do you know Gustavo Velez (ph)?' And I said, 'Yes, I

18    do.' And then she said, 'Well, he's dead.' So why would I go

19    and make you notes about somebody that is dead? I don't think

20    that's got any point, all these kilos that I was selling to

21    him, or he was selling to me. Why would I make a point over

22    somebody that's dead? And why would she make a second -- or

23    whoever made it -- a second indictment with somebody that is

24    dead, to pick me up from Mexico?

25         I could have paid the Mexican government to not let

1   me come.  They offered me.  They said, 'Pay us some money.

2   We'll leave you here.'  I said, 'No.  I'm being blessed by

3   going back to the states 'cause I'm going to give my country --

4   the country back to my daughters and my wife.'  I could have

5   paid them.  They asked me for $10,000.  And they said, 'We'll

6   let you free.  There's Americans waiting.'  And I said, 'No.  I

7   want to go back.'

8           And now, here I come up with 27 years?  And -- and

9   this indictment, I have proof 'cause they showed it to me

10  twice, and they even showed it to me on the plane.  There was a

11  Cuban guy from -- from Tucson, an FBI agent.  You think I'm

12  going to -- I'm going to try to contact the government for me

13  to do life in prison?  I -- I'd have to be the -- the dumbest

14  guy on earth.  I called -- I -- I called them.  They had my

15  phone number.  That's how they found me.  I to- -- I even took

16  them to the ho- -- to -- to -- to a hotel.  I bought dinner for

17  the guy.  And I told him, 'I -- I just want my -- you know, my

18  sentence back.  I want to go back.'  And I don't think

19  anybody's going to call an FBI agent to come to Guadalajara

20  when I'm a fugitive for me to serve the rest of my life in

21  prison.  I'd rather be dead.

22          So I think I -- I -- I'm entitled of discovery and

23  the truth, you know, and -- and go over it and come up with a

24  different defense -- or at least read what they're saying about

25  me.  I never even had one in '93.  You know?  So all -- all --

1  |  all this information, I mean, I -- is very critical, and -- and
2  |  all these notes, Your Honor, I -- there's a lot of them that I
3  |  didn't -- I didn't say anything about them, especially this BMW
4  |  that they're talking about.  I tried to sell him a Camaro.

5  |  Why should I buy a BMW when I was selling cars?  I'd
6  |  go to the auctions and get them for half price.  Why should I
7  |  buy one from the street when I go to auctions and buy five of
8  |  them, repos?  I don't buy them from the street.  So that's a
9  |  lie that I tried to buy a 733i?  Back in '91?  Doesn't cost
10 |  $14,000.  733s cost $30,000.  It's a BMW, the biggest one they
11 |  make, and that was a 750.  You can't buy -- unless -- unless
12 |  it's a cheap BMW, like a 318, but not a 733.  That's the 7
13 |  series; that's the most expensive one.  You can't pay a kilo
14 |  for one of those cars.

15 |  So I think Your Honor, I'm -- I'm entitled to --
16 |  to -- to get an ex- -- I mean, to get my discovery, and I beg
17 |  you to give me an extension 'cause I never lied to anybody.

18 |  THE COURT:  Thank you, sir.  Mr. Burgess, anything
19 |  further you need to add?

20 |  MR. BURGESS:  You know, Your Honor, other than to
21 |  point out the fact that this is the second time discovery was
22 |  made available to Mr. Moreno and his counsel.  It was provided
23 |  after our initial hearing upon his arrest; we provided Mr.
24 |  Bryson with these copies.  But all of this material, as I
25 |  pointed out to Mr. Bryson, was made available to Mr. Scotti

1    back in 1994.

2        THE COURT:  Including Ms. Henderson's notes?  No.

3    That would --

4        MR. BURGESS:  No, no, no, because --

5        THE COURT:  That wouldn't have --

6        MR. BURGESS:  -- that was --

7        THE COURT:  -- been available then.

8        MR. BURGESS:  -- that was after the plea agreement.

9    That was created after the fact.  That's the only new item of

10   discovery.

11       I guess I would also point out that Mr. Moreno

12   provided absolutely no assistance whatsoever because he fled.

13   The government was able to conclude its investigation and

14   prosecution of a number of co-conspirators absent Mr. Moreno's

15   assistance because he simply wasn't here.  He was hiding in

16   Mexico.

17       The only other thing, I guess again, I would point

18   out is this information Ms. Henderson testified to today, I

19   think, more than supports the amounts of drugs calculated in

20   the PSR.  And that's about all I have to say, Your Honor.

21       THE COURT:  Mr. Bryson, anything else?

22       MR. BRYSON:  The -- I guess the principal concern

23   that Mr. Moreno has, and the difficulty that I've had, is I was

24   given all of the document discovery and witness statements in

25   September this year, and I've been through all of that, and

1    quite frankly, when you go through all of it, it comes down to
2    one paragraph in Ms. Arismendy's statement, and then there are
3    about six different places where Mr. Echavarria, in multiple
4    debriefings, mentions Mr. Moreno, and then we have Agent
5    Henderson's notes.  That's really the only thing in this huge
6    stack of discovery that is relevant to Mr. Moreno.

7         But the difficulty I was having was that Mr. Moreno
8    indicated to me that -- and I don't have a tape recording that
9    I can play for him of his debriefing, obviously, and he has a
10   very different memory of it than Ms. Henderson does.  And so
11   when I've tried to go over that with him, I don't get very far
12   because they're at polar extremes, one from the other.  And --
13   but I have reviewed everything in the case.  I think the
14   difficulty we have in this case is that we are stuck with a
15   plea agreement from 1994 that went sideways, and Mr. Moreno
16   thinks he should get credit for what he did, and the government
17   thinks otherwise.  And I've not been able to quite resolve that
18   issue because the guideline implications of this are extreme.

19        Did you want to entertain sentencing remarks in
20   general at this time or just --

21             THE COURT:  No.  No.

22             MR. BRYSON:  No.

23             THE COURT:  I've got what I need at this point.
24   Speaking generally first, I'm satisfied that it is appropriate
25   for us to proceed at this time with sentencing.  I am satisfied

1    that, largely because of the cooperation from the government,

2    but also because of a continuance that has postponed sentencing

3    in this case for a month or thereabout, defense counsel --

4    present defense counsel has had access to all of the

5    information that was relevant to sentencing in this case.  I'm

6    confident that it has been discussed, or that there has been a

7    lot of serious attempts to discuss it, with Mr. Moreno.

8        And I can understand his not wanting to hear what

9    he's being told, but I am satisfied that the discovery that Mr.

10   Moreno is talking about, namely, disclosure of the relevant

11   conduct that he's answerable for under this plea agreement, has

12   been disclosed to him thoroughly and completely, and I'm

13   satisfied that there is no impediment to our proceeding with

14   sentencing on that basis.

15       Getting to the specifics of the quantity of drugs

16   involved here, I am satisfied that Mr. Moreno, in his own

17   discussions with federal agents after the plea agreement in

18   this case, has confirmed what the presentence report found and

19   suggested from other sources, namely, that Mr. Moreno was

20   chargeable with the two kilos involved in the offense of

21   conviction, the actual facts that gave rise to the indictment,

22   and that on relevant conduct terms, he is answerable for

23   somewhere between 15 and 25 kilos of cocaine, which has been

24   converted into the equivalent amount of marijuana.  And when

25   that conversion is accomplished, there is no doubt that this

1   case falls -- and I find that it falls -- in the range of 3,000
2   to 10,000 equivalent kilos of marijuana, based upon the
3   underlying finding that there are at least 15 and perhaps as
4   many as 25 kilos of cocaine involved in this case.  And that
5   comes from Mr. Moreno's own mouth.

6         I'm satisfied that Ms. Henderson is telling it the
7   way it was, and understandably, I think Mr. Moreno just doesn't
8   want to remember what was said in his discussions with Ms.
9   Henderson after his change of plea.

10        The Court finds that the base offense level in this
11  case is 34.  There is a two-level adjustment for obstruction
12  based upon Mr. Moreno's flight.  That gives us a total offense
13  level of 36.

14        With respect to the defendant's criminal history, I
15  am concerned that the combined effect of the prior convictions
16  which involve, basically, theft and theft type offenses --
17  there are no prior drug convictions, there are no serious
18  violent felony type offenses.  The four points that flow from
19  the prior convictions, coupled with the two points for being on
20  probation and the one point for being within two years of the
21  last prior imprisonment, I think, present a bit of a problem.
22  I find that although it is not permitted by the plea agreement,
23  I am going to depart one point because of my finding that a
24  Criminal History Category 4 significantly overstates the
25  seriousness of Mr. Moreno's prior record.  I'm going to depart,

Executary Court Reporting
626 Cordova, Suite 104
Anchorage, AK 99501
Phone:  (907) 272-4084

1    again, one point.  That gives us six instead of seven, and

2    therefore, I find that the appropriate criminal history

3    category in this case is 3, not 4.

4          Extending an Offense Level 36, Criminal History

5    Category 3 into the sentencing matrix, we're looking at 235

6    months to 293 months.

7      (Pause)

8          THE COURT:  The range for supervised release is four

9    to five years.  The fine range at 36 is $20,000 to $2,000,000.

10    Special assessment is $50 given the age of this case, which

11    goes back to prior to the increase in that amount.

12          Mr. Burgess, the government's final recommendation?

13          MR. BURGESS:  I think the government's recommendation

14    only changes by virtue of the Court's findings in regard to the

15    guideline calculation.  Our recommend is -- recommendation's

16    still that it be toward the top of the guideline range.  And

17    that's for a couple of reasons.

18          First, I think it's, as has been made clear through

19    this sentencing hearing, that Mr. Moreno was a large-scale

20    dealer of cocaine.  And I think that the government has not

21    tried to add time through additional relevant conduct by adding

22    on a host of additional cocaine amounts that, theoretically, it

23    could have, but only tried to support the PSR findings.

24          That being said, however, I think the sentence

25    fashioned within the guideline calculation should reflect the

1    fact that Mr. Moreno is a -- was a large and serious cocaine

2    dealer.  I think it's also important that he fled and not only

3    didn't cooperate but hid in Mexico for a substantial number of

4    years.  And so I think that the sentence should be at the top

5    of the guideline range, Your Honor.

6            THE COURT:  Mr. Bryson?

7            MR. BRYSON:  Your Honor, this is a unfortunate case

8    for Mr. Moreno.  I don't know what would have happened had Mr.

9    Scotti remained for all the debriefings for three days as Mr.

10   Cavanaugh and Mr. Curtner did.  It might have been that the

11   discussions wouldn't have gone sideways as they did.  But we

12   can't fix that now.  But I think what Mr. Moreno is now facing

13   is that by making that bad decision on March 17th, 1994, he's

14   taken himself out of what was a relatively attractive plea

15   agreement and placed himself right in the middle of the

16   sentencing guidelines and, through his own debriefing, has

17   really brought himself down.

18           And I think that that is unfortunate.  I think that

19   had that debriefing either not happened, he might well have not

20   been in the same situation on relevant conduct, or had it

21   happened so that he stayed around and did cooperate, he might

22   well have gotten back to that position where the government

23   argued for a downward departure.  He didn't, but when you look

24   at a man of 39 years old, with his relatively soft criminal

25   history, and you look at the severe sanctions of the

1  guidelines, I see absolutely no need, in this case, on these

2  facts, to move upward from the bottom of the range.

3         And I realize, of course, that I would argue very

4  different things if this Court had discretion or, in

5  discussions I've had with Mr. Moreno, I certainly looked at the

6  issue of whether or not, you know, there was anything to do

7  about his plea once everything changed on him.  I have

8  concluded, legally, I am in a awkward and tough position in

9  making those arguments.  And so at this point, I would urge

10  Your Honor to look at the overall facts of this case and,

11  because of the severity of the sentence, with what he has done

12  to himself by some bad judgment calls, sentence him at the low

13  end of the range.

14         THE COURT:  Thank you, Mr. Bryson.

15     (Pause)

16         THE COURT:  Mr. Moreno, is there anything you -- else

17  you want to tell me?  Now, please don't repeat what you've said

18  before, but if there's anything else that you want to tell me

19  about sentencing, I'll hear it.

20         THE DEFENDANT:  I just want you to, if you please,

21  you know, have some mercy on me.  You know, I got two daughters

22  and my wife.  And I'm -- I'm sorry about all the problems I

23  caused to the people for United States, and the Court, and

24  everybody.

25         THE COURT:  Okay.  Thank you.  Give me just a moment,

1    please.

2        (Pause)

3        THE COURT:  Based upon the defendant's plea of guilty

4    to a violation of 21 United States Code, § 846, conspiracy to

5    distribute controlled substances, the defendant has been found

6    guilty of that offense.  Pursuant to the Sentencing Reform Act

7    of 1984, it is the judgment of the Court that the defendant,

8    Jaime Ernest Moreno is hereby committed to the custody of the

9    United States Bureau of Prisons for imprisonment for a term of

10   thir- -- 235 months.

11       Upon release from imprisonment, the defendant shall

12   be placed on supervised release for a term of five years.

13   Within 72 hours of his release from custody of the Bureau of

14   Prisons, and if not deported, the defendant shall report in

15   person to the Probation Office in the district to which he has

16   been released.  While on supervised release, again, if the

17   defendant is not deported, he shall not commit another federal,

18   state, or local crime; shall not possess a firearm or illegal

19   controlled substance; and shall comply with the standard

20   conditions of supervision, which will appear in printed form in

21   the Court's judgment.

22       In addition, the following special conditions of

23   supervised release are imposed:

24       First, the defendant shall submit to the warrantless

25   search of his person, residence, vehicle, or place of

1    employment at reasonable times, in reasonable manner, and based

2    upon a reasonable suspicion of the presence of contraband or

3    evidence of a violation of a term or condition of supervised

4    release.  Failure to submit to such search may be grounds for

5    revocation of supervised release.  Defendant shall not reside

6    at any location without having first advised other residents

7    that the premises may be subject to searches pursuant to this

8    condition.

9         Second, the defendant shall not possess a firearm,

10   destructive device, or other weapon.

11        And third, the defendant shall comply with the rules

12   and regulations of the Immigration and Naturalization Service

13   of the United States and, if deported from the United States,

14   either voluntarily or involuntarily, shall not re-enter the

15   United States illegally.  Upon any re-entry into the United

16   States during the term of Court-ordered supervision, the

17   defendant shall report to the nearest United States Probation

18   Office within 72 hours.

19        (Pause)

20        THE COURT:  With respect to the payment of a fine,

21   the Court imposes the minimum fine in this case, which is

22   $20,000, which is due and payable forthwith.  Any remaining

23   amount owed after the defendant's release from the custody of

24   the Bureau of Prisons shall be paid on a schedule to be

25   determined by the defendant's Probation Officer, if he comes

1  under supervised release.

2  Defendant is ordered to pay the special assessment of

3  $50, which is due and payable forthwith.

4  Mr. Moreno, there's only one reason why I've given

5  you the minimum sentence that's available to me under the

6  guidelines in this case, and that's because of your age.  After

7  you serve about 20 years, which 235 months is almost 20 years,

8  you're going to be about 59 years old.  And I think that's

9  enough.

10  Anything further we need to do, Mr. Burgess?

11  MR. BURGESS:  No, sir.

12  THE COURT:  Mr. --

13  MR. BRYSON:  No, Your Honor.  I'll go over the

14  appellate rights with Mr. Moreno.

15  THE COURT:  Okay.  I'm going to do that myself before

16  we --

17  MR. BRYSON:  Okay.

18  THE COURT:  -- conclude.

19  Mr. Moreno, if you have not given up your right to

20  appeal in your plea agreement -- and I think you probably

21  didn't -- you do have the right to appeal the Court's

22  sentencing decisions in this case.  If you wish to appeal and

23  cannot afford to hire a lawyer to appeal, one can be appointed

24  to assist you in an appeal.  Any appeal from this Court's

25  judgment must be taken within 10 days from the entry of

1    judgment.  You should assume that judgment will be entered

2    either today or tomorrow.  So the time is almost running now.

3            We'll be in recess while our next matter is being set

4    up.

5            THE CLERK:  All rise.  This matter's adjourned.  This

6    Court now stands in brief recess.

7

8        (Whereupon, the proceedings were adjourned at 9:40 a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

## C E R T I F I C A T I O N

2

3

STATE OF ALASKA            )
4                                                 )  ss.
THIRD JUDICIAL DISTRICT     )
5   ——————————————————————————)

6

7           I, **CINDY S. CARL**, do hereby certify:

8           (1)  That the foregoing pages contain a full, true, and

9    correct transcript of proceedings in the above-entitled matter,

10   transcribed by me, or at my direction and supervision, to the

11   best of my knowledge and ability.

12           (2)  That I have been certified for transcript services

13   by the United States Courts.

14           (3)  That I was certified for transcript services by

15   the Alaska Court System prior to January 1, 1993.

16

17

18

19

20   SIGNED AND CERTIFIED:

21

22   BY: _Cindy S Carl_                              DATE: 11/24/99
23       Cindy S. Carl
         Certified Court Reporter
24

25

**Executary Court Reporting**
  626 Cordova, Suite 104
  Anchorage, AK 99501
  Phone: (907) 272-4084