ORIGINAL
FILED

JUN 2 3 2005

UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA
By _____
Deputy

# UNITED STATES DISTRICT COURT

## DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | Case No. A93-0127 (HRH) |
| ) | |
| Plaintiff, ) | Anchorage, Alaska |
| ) | Tuesday, May 10, 2005 |
| vs. ) | 8:11 o'clock a.m. |
| ) | |
| JAIME MORENO, ) | **RE-SENTENCING HEARING** |
| ) | |
| Defendant. ) | |

---

### TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE H. RUSSEL HOLLAND
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:
JOSEPH BOTTINI, ESQ.
Assistant U.S. Attorney
U.S. Attorney's Office
222 West 7th Avenue, #9
Anchorage, Alaska    99513-7567
(907) 271-5071

For the Defendant:
HUGH FLEISCHER, ESQ.
Attorney at Law
310 K Street, Suite 200
Anchorage, Alaska    99501
(907) 264-6635

Probation Officer:
BARBARA NICHOLS
U.S. Probation Service
222 West 7th Avenue, #48
Anchorage, Alaska    99513
(907) 271-5492

Court Recorder:
ROBIN CARTER
U.S. District Court
222 West 7th Avenue, #4
Anchorage, Alaska    99513
(907) 677-6127

**NoDak Rose Transcripts**
721 North 19th Street
Bismarck, North Dakota  58501-4721
(701) 255-1054



1    Transcription Service:        NODAK ROSE TRANSCRIPTS

2                                  721 North 19th Street
                                   Bismarck, North Dakota   58501
3                                  (701) 255-1054

4    Proceedings recorded by electronic sound recording.
     Transcript produced by transcription service.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1          ANCHORAGE, ALASKA - TUESDAY, MAY 10, 2005

2      (Call to Order of the Court at 8:11 a.m.)

3      (All parties present; defendant present)

4          THE COURT:  Good morning, ladies and gentlemen.

5          MR. BOTTINI:  Morning, Your Honor.

6          MR. FLEISCHER:  Morning, Your Honor.

7          THE DEFENDANT:  Good morning.

8          THE COURT:  We're convened in Case A93-127 Criminal,

9  United States versus Moreno.  We are here for a re-sentencing

10 hearing.  As the first order of business, I want to review with

11 you where I think we are, especially as regards the presentence

12 report that was filed in this case.

13          In Mr. Moreno's case, he was indicted by a federal

14 grand jury of violating 21 United States Code, Section 846,

15 conspiracy to distribute controlled substances.  There was at

16 one time a plea agreement in this case; however, it was

17 abandoned and the defendant went to trial and was convicted of

18 the conspiracy charge.  As result of appeal processes, he is

19 back before us at this time for re-sentencing, the conviction

20 of the conspiracy charge having been affirmed.

21          In connection with this morning's hearing, I have

22 received and reviewed the presentence report prepared by

23 Probation Service.  I've also received and reviewed a

24 supplemental presentence report that is undated, which deals

25 with paragraphs fifty-five through fifty-nine of the original

4

1 │ report.  Has everyone received that supplement to the
2 │ presentence report?
3 │         MR. BOTTINI:  The Government has, Your Honor.
4 │         MR. FLEISCHER:  Yes, we have, Your Honor.
5 │         THE COURT:  Thank you.
6 │         MR. FLEISCHER:  Let me advise Your Honor as I have
7 │ the party and the Probation Officer, that Mr. Moreno has
8 │ retracted his objection to paragraph fifty-eight of the
9 │ presentence report.  He --
10 │        THE COURT:  I'm not surprised.  It's been deleted.
11 │        MR. FLEISCHER:  Well, okay.
12 │        THE COURT:  Thank you, Mr. Fleischer.
13 │        MR. FLEISCHER:  Yeah.
14 │        THE COURT:  Mr. Fleischer, have you personally
15 │ reviewed the presentence report and discussed it with your
16 │ client?
17 │        MR. FLEISCHER:  I have, Your Honor.
18 │        THE COURT:  Mr. Moreno, have you personally reviewed
19 │ the presentence report?
20 │        THE DEFENDANT:  Yes, Your Honor --
21 │        THE COURT:  Thank you.
22 │        THE DEFENDANT:  -- I have.
23 │        THE COURT:  I'm not aware of any information being
24 │ withheld from the presentence report pursuant to Rule 32, and
25 │ again, I have reviewed the original report as well as the

5

1    supplement to it.

2          In addition to the presentence report, I've received

3    and reviewed the sentencing memoranda that have been submitted

4    by counsel.  I've also received and have reviewed a letter from

5    -- I believe it's Mr. Moreno's sister, is it?

6          MR. FLEISCHER:  Yes.

7          THE COURT:  Anna Moreno.

8          MR. FLEISCHER:  And also there's a letter from his

9    wife, Barbara Moreno?

10          THE COURT:  I haven't seen that.

11          MR. FLEISCHER:  Oh, really?  I thought that was sent

12    over.  Sorry, Your Honor.  Let me just get that.

13                    (Pause - side conversation)

14          THE COURT:  Is that an extra copy, Mr. Fleischer?

15          MR. FLEISCHER:  Yes, it is, Your Honor.

16          THE COURT:  Thank you very much.  Give me just a

17    moment to review it.

18                         (Pause)

19    I have reviewed Mrs. Moreno's letter.

20          In connection with this proceeding, I have filed and

21    delivered to counsel an order which outlines the course that

22    I'm going to try and follow for purposes of this sentencing

23    proceeding, and the first order of business will be to review

24    with you what I have gotten out of the presentence report.

25          The report finds that for purposes of the guidelines,

6

1  Mr. Moreno's base offense level should be thirty-four. It

2  finds that there should be a two-level upward adjustment under

3  Guideline 3C1.1 for obstruction, which in this instance was a

4  failure to appear in court as required. That gives the an

5  adjusted offense level of thirty-six. The report finds that

6  acceptance of responsibility does not apply in this case and,

7  therefore, the total offense level should be thirty-six.

8           It's my impression -- and Mr. Bottini, if you would,

9  please tell me does the Government adopt that view of the

10  matter?

11          MR. BOTTINI: Yes, we do, Your Honor.

12          THE COURT: All right. The defendant has suggested a

13  rather different approach to sentencing here. For purposes of

14  the guidelines, it's my understanding that the defense would

15  have the Court find that the base offense level is twenty-six,

16  which I think is the guideline that comprehends two kilos of

17  cocaine. The defense would have the Court find that Mr. Moreno

18  was a minimal participant under Guideline 3B1.2(a), which

19  would, if applied, result in a four-level downward adjustment.

20          It's my impression -- and Mr. Fleischer, tell me if

21  I'm right or wrong -- that the defense does not contest a two-

22  level adjustment for obstruction?

23          MR. FLEISCHER: That is true, Your Honor.

24          THE COURT: All right. The defense also suggests

25  that the defendant should receive a two-level reduction for

7

1  acceptance of responsibility under Guideline 3E1.1, and if my

2  mathematics are correct, that would give us an offense level of

3  twenty-two rather than thirty-six.

4          So that you all will know what I am thinking about

5  these particular calculations before you have your last say on

6  them, let me tell you that I am still of the mind that Mr.

7  Moreno is responsible for relevant conduct, which would get him

8  up to about fifty-six hundred and ten grams -- kilos of

9  equivalent marijuana, based upon the testimony of the FBI agent

10  who gave extensive testimony in this matter when we were last

11  together.  Her testimony is in a transcript that's part of the

12  record at Clerk's Docket 178.

13          My finding last time that there was in excess of

14  fifty-six hundred kilos of equivalent marijuana in this case

15  does not change the base offense level any.  The report, I

16  believe, finds some three thousand kilos, and both of those

17  numbers are within the thirty-four base offense level.  So

18  tentatively, I am at the same point that the Government is on

19  the base offense level here.

20          There isn't any disagreement about the two-level

21  adjustment for obstruction.  I've evaluated the contention

22  about minimal participation, and I'll hear from counsel about

23  that.  I've evaluated the acceptance of responsibility

24  situation, and I will also hear from people about that.

25          One final thing about offense level calculations, I'm

8

1  under the impression that nobody is asking for any guideline

2  type departures with respect to the offense level.  Am I

3  correct about that?

4          MR. BOTTINI:  That's correct.

5          MR. FLEISCHER:  That's correct, Your Honor.

6          THE COURT:  All right.  Mr. Fleischer, is there

7  anything more that you wish to tell me about your view of the

8  offense level calculation?

9          MR. FLEISCHER:  Yes, I believe so, Your Honor, if I

10  may.

11          THE COURT:  You may.

12          MR. FLEISCHER:  We believe that the so-called

13  relevant conduct that was placed into the presentence report

14  based upon Special Agent Henderson's testimony, as well as the

15  statements from a co-defendant, Mr. Echevarria, should not be

16  taken into consideration.

17          And we're looking at the actual cases that were taken

18  to the United States Supreme Court.  The Wisconsin case of

19  Freddie Booker, he was convicted for selling more than fifty

20  grams of crack cocaine, and that, of course, required at least

21  a ten-year sentence, but at the sentencing, the district judge

22  found additional facts, including Booker's possession of six

23  hundred and fifty-eight point five grams of crack cocaine and

24  obstruction of justice and a criminal record.  And of course,

25  as you know, Your Honor, the Supreme Court held that the trial

1   court sentence violated the Sixth Amendment in that situation.

2         Conversely, in the companion case of <u>Duncan Fanfan</u>,

3   that was the main case, the main district court case, and there

4   the trial judge was confronted with a conviction for possession

5   of -- just in this case, possession of five hundred or more

6   grams of cocaine, that's precisely what the special verdict

7   provided in the <u>Moreno</u> case.

8         And the judge was aware of additional facts that

9   certainly could have elevated Mr. Fanfan's sentence way up from

10  that determination; however, in that case, the U.S. District

11  Judge under <u>Blakely</u> rebuffed the sentencing guidelines and

12  ruled defendants could only be sentenced based upon the jury's

13  factual findings.  And as we know, the high court held that

14  that trial record trial ruling was correct.

15        So we feel that we have very strong support from

16  those cases that came down from the United States court to say

17  that this relevant conduct should not be taken into account,

18  and that he should be held to the responsibility of what the

19  jury finding was.

20        Now in addition to the overall feeling that the

21  relevant conduct should be just simply put off the table

22  altogether under those authorities, we feel, respectfully, that

23  Special Agent Henderson's notes and her testimony, which Your

24  Honor found were deficient and very confusing and difficult in

25  -- in the transcript that we have -- there were no FBI 302s

1  which we're all familiar with.  Of course, the FBI does not

2  provide any recordings, so there's no recording.  There are

3  only these very cryptic and, quite frankly, contradictory notes

4  and, moreover, contradictory testimony from Special Agent

5  Henderson.  Because she testified in 1999 in this matter and

6  she also testified in 2002.

7          And as an example of that charge, in 2002 Ms.

8  Henderson testified that Mr. Moreno received four kilograms of

9  cocaine at page 19 of the transcript, and in 1999, talking

10 about the same period, she said that he sold eight kilograms at

11 page 15 of the transcript of the '99 hearing.  And of course,

12 in 2002 at page 13, Ms. Henderson admitted a mistake in saying

13 that the defendant made statements about having been involved

14 with thirteen kilograms, but rather it was the co-defendant, a

15 cooperating witness, Mr. Echevarria.

16         And then in 1999 on page 20, in the period of April

17 of 1991, he indicated he purchased -- that Mr. Moreno purchased

18 one kilogram from Mr. Velez, and in -- well, in 1999, he -- she

19 said that he was trying to purchase a car from Mr. Velez, and

20 in nineteen -- in 2002, at page 20, she says that the defendant

21 was selling the car to Mr. Velez, completely opposite from one

22 another.

23         In 1999, page 21, she said the defendant took one

24 kilogram from Mr. Velez; in 2002, she said at page 24 that he

25 took four kilograms.  And the very extensive statement about

1   the various people who were supposedly the recipients of those

2   four kilograms in 2002 were not even mentioned in '99, a much

3   closer point in time to when all of this was to have happened.

4        In 2002 at pages 28 and 29, she talks about five

5   kilograms from Mr. Echevarria; in '99 at page 15, she said that

6   there were thirteen kilograms.  In '02 at page 32, she said at

7   the end of '91, Mr. Echevarria gave twenty-six kilograms to

8   Gustavo (ph) Velez and some of which went to Moreno, she said;

9   in 1999, there was no reference to twenty-six kilograms, some

10  of which went to the defendant.  None of that was even

11  referenced.  That's a very substantial allegation and the one

12  that was basically the heart of the presentence report that

13  Your Honor has looked at and commented on, and in the earlier

14  time, there was no reference to that figure by Ms. Henderson.

15       In '02 at page 24, she said he transferred two

16  kilograms to Mr. Echevarria, and that Mr. -- co-defendant, Mr.

17  Jiminez (ph), I guess, was present during the 1992 transaction.

18  In 1999 on page 23, she said that he -- during the period of

19  February and March of '93, purchased two pounds of marijuana.

20  No correlation whatever during the same period of time in 2002

21  about the marijuana matter.  In fact, it was talking about

22  kilograms of cocaine.

23       In '02 at page 38, between the time of February and

24  April of '93, she said defendant purchased three kilograms of

25  cocaine; in '02 at page 40, she said that it was twenty-eight

1  kilograms.  In 1999, there's no reference whatever to the

2  twenty-eight kilograms.

3          In '02 at page 43, she said that the Peruvian fellow,

4  Victor Neira, talked about to some extent.  There's no

5  reference to that in 1999.  And in '02 at page 43 again, she

6  said that Velez had a different driving licenses and that was

7  related to his knowledge.  There's no reference to that in the

8  1999 transcript of her testimony.

9          Moreover, in many respects the notes themselves,

10  which we've looked at extensively, as to the specific testimony

11  that Ms. Henderson was giving, really cannot be found

12  consistent with a number of the statements that were made.

13  They simply do not provide a basis for the testimony and, of

14  course, there was -- and again, this is -- underscores Your

15  Honor's own observations as to why there should have been a 302

16  or something much more professional in this matter -- there was

17  -- there were years between the actual interview and the

18  testimony even in 1999, of course even more years in 2002.

19          And so, I think it's extraordinarily difficult for

20  anyone given those cryptic notes that Ms. Henderson had and the

21  contradictory nature of them and the omissions that were there,

22  to have a basis for forgetting the testimony that she had.  And

23  as a result, we see huge conflicts between her testimony in '99

24  and 2002, and they're so much so that we feel that those notes

25  simply should not -- nor the testimony that's based upon those

13

1   notes, should not be taken into consideration by this Court.

2          And moreover, the additional basis for the elevation

3   of these kilograms that are from this co-defendant who was a

4   cooperating witness, who was in fact attempting, as every

5   defendant was doing, to try to get the lowest sentence

6   possible, and he was making statements about Mr. Moreno which

7   he simply did not have a basis for, we feel.

8          We feel that he clearly went way over the top in

9   terms of making statements about Mr. Moreno, including one that

10  the Government has not adopted, but it's emblematic of his

11  testimony.  He indicated that there was a gun involved, and we

12  feel that the fact that that allegation has not been adopted by

13  the Government, which it should not be, should really be

14  stricken from the presentence report because as Your Honor

15  knows, the presentence report is definitely looked at as the

16  bible by the Bureau of Prisons, and that can definitely have a

17  major impact -- a negative impact on his situation.

18         And so we feel though in sum, Your Honor, that the

19  relevant conduct that has been portrayed here is simply not

20  credible and should not be taken into account.  We think on the

21  broader range, it obviously has not been subjected to the jury

22  or to any kind of basis for the standard the jury would have.

23  And obviously, Ms. Henderson could have testified before the

24  jury and given some information about all this -- about

25  matters, but it didn't happen.

1        And we think that just as in the <u>Fanfan</u> case where

2 there were relevant conduct matters that could have escalated

3 Mr. Fanfan's sentence way over what it was from his -- the jury

4 determination, that's exactly what we have in the <u>Moreno</u> case.

5 The special verdict of this jury found that he had sold more

6 than five hundred grams but less than five kilograms of

7 cocaine, and we believe that that is the determinative basis

8 for his re-sentencing.  And we thank you, Your Honor.

9        THE COURT:  Mr. Bottini?

10        MR. BOTTINI:  Well, not surprisingly, we take a

11 completely opposite view of what the purpose here today of re-

12 sentencing is.

13        The Government's position that there is nothing in

14 <u>Booker</u> and <u>Fanfan</u> which would lead to the conclusion that this

15 is now an "all-ee all-ee outs in free" type situation where Mr.

16 Moreno can once again contest relevant conduct issues and other

17 issues in the presentence report, which this Court not only

18 once but twice has dealt with and made specific findings of

19 fact which the circuit upheld on appeal the last time around,

20 finding that even if clear and convincing evidence were the

21 standard here, that your findings met that burden.

22        And those findings were made after evidentiary

23 hearings of some length, as you recall.  I didn't represent the

24 Government the last time around in this case, but I do know

25 from reviewing the record that there was extensive discussion

15

1    about Henderson's notes and what do they mean, are they
2    consistent, inconsistent, whatever.  Well, you weighed that out
3    the last time around, obviously, and made specific credibility
4    findings after all that was argued.
5           So either we're back here today in a posture where,
6    you know, we're going to re-litigate all of the relevant
7    conduct issues, which the Government strongly asserts is not
8    the position that we're in, or this case was remanded for re-
9    sentencing in light of <u>Booker</u> and <u>Fanfan</u> for the Court to
10   determine whether you would impose the same sentence given that
11   the guidelines are not mandatory, they are advisory.
12          And in that regard, we would submit that <u>Booker</u> and
13   <u>Fanfan</u> obviously did not abrogate the sentencing guideline
14   scheme, they're now advisory to the Court, and you're required
15   to go through the analysis that you've done twice before in
16   this case after hearing evidence and hearing testimony as far
17   as where does Mr. Moreno score out under the guidelines given
18   all relevant considerations concerning not only the jury's
19   trial verdict, but the relevant conduct issues as well.
20          So we would submit there's nothing in <u>Booker</u> and
21   <u>Fanfan</u> which means that the Government now has to prove beyond
22   a reasonable doubt, as it is suggested in the sentencing
23   memorandum of Mr. Moreno, these relevant conduct issues, nor is
24   it an opportunity having been remanded by the circuit at this
25   point, to re-litigate the relevant conduct issues.

1    THE COURT:  With respect to the offense level

2  discussions that we just had, firstly, I'm satisfied that the

3  combined Booker-Fanfan decisions do not tell me that relevant

4  conduct should be ignored.  On the contrary.  What Booker-

5  Fanfan does is leave the guidelines totally in place, but they

6  are made advisory, not mandatory.  Relevant conduct is still on

7  the table, it is still something that the Court must consider

8  in imposing sentences, treating the guidelines as advisory.

9    With respect to the base offense level in this case,

10  I re-adopt the findings that I made in the first instance as

11  regards the quantity of drugs for which Mr. Moreno is

12  responsible.  My findings were that he was responsible for

13  fifty-six hundred and ten kilos of equivalent marijuana.

14    If and to the extent that there are situations where

15  the Court ought to indulge in inferences in favor of a

16  defendant when a case is right on the borderline of a guideline

17  change in numbers, we simply don't have that type of case.  The

18  presentence report finds over three thousand kilos of relevant

19  conduct in equivalent marijuana.  My number is considerably

20  higher than that.  Even if the number from the presentence

21  report were used, we would still be in base offense level

22  thirty-four.  So that is re-adopted.

23    The 3C1.1 obstruction adjustment is uncontested and

24  will therefore be included in the computation.

25    The request that Mr. Moreno be treated as a minimal

1  participant has been evaluated by me.  That adjustment will not

2  be made.  In that same 2002 hearing, I believe I have a

3  reference to it here.  Give me just a second.

4                              (Pause)

5  I believe it's at page eight, but that may not be correct, of

6  Clerk's Docket 178.  The Court there made a specific finding

7  that the relevant conduct that we were talking about as a

8  result of Agent Henderson's testimony was not conduct that Mr.

9  Moreno had no direct role in.

10             Putting it the other way, we were talking about

11  transactions in which, according to the testimony, Mr. Moreno

12  was directly involved, hands on involved.  This is not a

13  situation where he is being upgraded as far as his offense

14  level or anything else on the basis of transactions that other

15  people who were part of the conspiracy, but not Moreno, took

16  part in.  Because the testimony was that Mr. Moreno had his

17  hands on all of the drugs that we're talking about, he's not a

18  minimal nor a minor participant either.  He's a direct, full

19  participant in what was going on.  No adjustment for role in

20  the offense.

21             With respect to acceptance of responsibility,

22  Guideline 3E1.1 is in play here.  In this instance, Mr. Moreno

23  had not only the opportunity of obtaining this adjustment, but

24  also he had the opportunity probably of securing for himself a

25  significant reduction of his sentence by cooperating with the

18

1   Government, and apparently couldn't bring himself to do that.

2   As a consequence, the Government was put to its proof, and that

3   is not the stuff of which acceptance of responsibility is made.

4   No adjustment for acceptance of responsibility.

5           The Court finds that the total offense level for Mr.

6   Moreno is as it was before, thirty-six.

7           We'll turn next to the criminal history category.

8   Here there are some changes, as you know, as a result of the

9   supplement to the presentence report.  The presentence report

10  at this point finds that there are three rather than I believe

11  it was five before criminal history points flowing from prior

12  convictions.  The current report finds that there should be a

13  two-point adjustment rather than a three-point adjustment that

14  was in the original report.  As a consequence of those changes,

15  the total points now are five, which puts Mr. Moreno in

16  criminal history category three.

17          Mr. Bottini, am I correct that there isn't any

18  dispute from the Government about the criminal history

19  calculation?

20          MR. BOTTINI:  That's correct, Your Honor.

21          THE COURT:  Mr. Fleischer, laying aside for a moment

22  your departure request, is there any dispute about the present

23  criminal history calculation?

24          MR. FLEISCHER:  Not about the present criminal

25  history category, Your Honor.

1    THE COURT:  All right.  There is, as I understand it,

2    a request that the Court should effect a guideline departure

3    with respect to the criminal history category.  Mr. Fleischer,

4    is there anything more you need to say about that?

5    MR. FLEISCHER:  Well, we feel very strongly that

6    based upon the facts in those cases that are being -- they are

7    used as a basis for these additional points, simply overstate

8    the seriousness of the conduct and that, therefore, under the

9    applicable guideline, that it should be lowered from criminal

10    history category three.  So that's our -- we set that out in

11    full in our brief.

12    THE COURT:  Yes, sir, you have.  Mr. Bottini --

13    MR. BOTTINI:  We feel, Your Honor, that category

14    three accurately represents the seriousness of Mr. Moreno's

15    criminal history, which includes three prior criminal

16    convictions and accurately assessed supervision points.  So

17    it's our view that category three basically hits it right on

18    the nose for his prior conduct.

19    THE COURT:  With respect to the criminal history

20    category, as you all know, I was previously of the view that

21    there should be a departure with respect to the criminal

22    history and, quite frankly, and I think it was probably obvious

23    from previous discussions, my concern previously was not with

24    the points that are attributable to prior offense.  My concern

25    was that adding two points for being on probation and adding

20

1    another point for committing an offense within two years of a

2    release from imprisonment escalated the three-point situation

3    unacceptably.

4           With the changes in the presentence report, my view

5    of the matter is quite different.  In the first place, one of

6    those adjustment points isn't on the table any longer and,

7    secondarily, what had been booked as a two-point offense should

8    have been a one-point offense.  Those two changes in the

9    calculation of the criminal history category very adequately

10   resolved my concerns that the total picture was being

11   overstated by a criminal history category four, which is where

12   we were before.

13          Even if I were to do what I did before and subtract

14   one criminal history point out of concern that it was still

15   being upgraded too much, a one-point reduction wouldn't change

16   things here.  We'd still be in criminal history category three,

17   even if I were to take a point off as I did before.

18          I'm satisfied that criminal history category three is

19   right and appropriate for purposes of advising me as regards

20   what I should do with sentencing in this case.  The request for

21   a departure under Guideline 4A1.3(b)(1), I believe it is, is

22   denied.

23          Next, for purposes of completing the guideline

24   process and extending the offense level thirty-six and criminal

25   history category three into the sentencing matrix of the

1  guidelines, we're looking at two hundred and thirty-five to two

2  hundred and ninety-three months for imprisonment, four to five

3  years for supervised release, probation is not available under

4  this situation, the fine range is twenty thousand to two

5  million dollars, restitution isn't an issue here, the special

6  assessment would be fifty dollars, but I understand has been

7  paid.  There isn't any forfeiture aspect to this case.

8          Mr. Bottini, is there any disagreement with those

9  extensions?

10          MR. BOTTINI:  No, Your Honor.

11          THE COURT:  Mr. Fleischer?

12          MR. FLEISCHER:  Well, yes, we object to the findings

13  as we said before, Your Honor, but we understand the Court's

14  ruling.  We would like to say that even though Mr. Moreno

15  understands his right to allocution before the sentence is

16  made, he has asked to take the stand and testify before this

17  matter is closed.

18          THE COURT:  Okay.  What I had envisioned doing was

19  hearing from you next about non-guideline matters, but in light

20  of what you have told me, I will leave it to you whether you

21  would like to present what you wish to have me consider by way

22  of allocution for Mr. Moreno first, or whether you want to talk

23  about non-guideline matters first.  Your choice.

24          MR. FLEISCHER:  He -- I think we'll ask him to take

25  the stand first.

1          THE COURT:  Fine.  Let's do that.

2                         (Pause)

3          THE CLERK:  If you'd raise your right hand, please.

4          **JAIME MORENO, DEFENDANT, SWORN**

5          THE CLERK:  Would you please have a seat?  And sir,

6    for the record, if you could state your name, spelling your

7    last name, please.

8          THE DEFENDANT:  Yeah.  My name is Jaime Moreno.  My

9    last name is M-O-R-E-N-O.

10         THE CLERK:  Thank you.

11         THE COURT:  Mr. Fleischer?

12                  **DIRECT EXAMINATION**

13   BY MR. FLEISCHER:

14   Q    State your name for the record, please.

15   A    Jaime Moreno.

16   Q    Mr. Moreno, you are the defendant in this proceeding, is

17   that correct?

18   A    Yes, I am.

19   Q    And what period of time have you -- for what period of

20   time have you been incarcerated?

21   A    I've been incarcerated a little bit over six years.

22   Q    Now in regard to the trial that you had, did you

23   acknowledge the fact that you had taken two kilograms of

24   cocaine?

25   A    Yes, I did.  I took two kilos of cocaine.  I actually took

1  responsibility in the trial and I admitted taking two kilos to

2  Mr. Echevarria in Los Angeles.

3  Q    And did you get paid for that -- that act?

4  A    Actually, yes, I did, and I took the money to whoever the

5  cocaine belonged to and I earn five hundred dollars for the

6  transaction.

7  Q    Did you have any involvement with Mr. Echevarria in regard

8  to any other transactions?

9  A    No, I didn't, sir.

10 Q    Did you have involvement with Mr. Velez-Montoya?

11 A    No, I didn't, sir.

12 Q    What was your knowledge of Mr. Velez-Montoya?

13 A    I met Mr. Velez-Montoya -- and this is where the notes

14 become very un -- untrue because Mrs. Henderson made these

15 notes -- fabricating these notes, saying that I met Mr. Gustavo

16 Velez in 1991, and I never met Mr. Gustavo Velez in 1991, I met

17 Mr. Jiminez in 1992, who introduced me to Mr. Velez in 1992.

18 So these notes right here, right from the get-go, states that I

19 met Gustavo Velez in 1991, and I never met him in '91.

20 Q    What -- well, assuming though -- you did meet him in 1992.

21 Did you have any dealings in drug matters with Mr. Velez-

22 Montoya --

23 A    No, I didn't.

24 Q    -- in '92 or any other time?

25 A    No, I didn't, sir.  The reason how I met Mr. Gustavo Velez

1    is Mr. Jiminez brought him to me to buy a car.

2    Q    Were you then working in a -- in an area --

3    A    I was -- I had a shop -- I had a shop, it was called E and

4    T Auto Refinisher up in North Hollywood.

5    Q    California.

6    A    California.  And Mr. Jiminez brought me Mr. Velez to buy a

7    car from me.

8    Q    All right.

9    A    It was -- had nothing to do with cocaine deals or

10   anything.

11   Q    Was that when your meet -- your first meeting with Mr. --

12   A    That was my first meeting --

13   Q    -- Velez-Montoya?

14   A    -- that was my first meeting with him.

15   Q    And what happened in that transaction?

16   A    Well, when he came over, he looked at the car, he asked me

17   to take it for a drive, and I did give him the keys.  He took

18   it for a drive and he brought it back like a half hour later,

19   and I was really upset 'cause I figure, you know, I never knew

20   the man, he stayed with Jiminez in my shop and he took the car

21   around, and test drove it for like over -- over a half hour to

22   maybe forty-five minutes, and brought it back.  And I told

23   Jiminez why is this guy taking forever, and comes back and he

24   never purchases the vehicle.

25   Q    Mm-hmm (affirmative).  Were you angry about that?

*Moreno - Direct*                                25

1   A    I was really mad, yeah.

2   Q    You mentioned Mr. Jiminez who was a person who intro --

3   who introduced you to --

4   A    Yeah.

5   Q    -- Mr. Velez-Montoya.  What dealings did you have with Mr.

6   Jiminez, if any?

7   A    With Mr. Jiminez?  I didn't -- I didn't have any dealings

8   -- Mr. Jiminez, what he was doing, it was up to his business.

9   Whatever he was doing had nothing to do with me.  Mr. Jiminez

10  bought a car from me, a Honda -- it was a Honda Accord, that's

11  how I -- that's how I dealt -- dealt with him.

12  Q    Did you at any time get in -- were involved with

13  marijuana?

14  A    No, I didn't, sir.

15  Q    Did you ever make any --

16  A    I have never sold, not even a joint, of marijuana.  I

17  never sold any -- any pot before.

18  Q    Do you have a brother-in-law who was involved in drug

19  dealing?

20  A    No, I don't, sir.  I don't have any brothers that I --

21  that I know that they're involved in cocaine deals.  See, let

22  me --

23  Q    When you say -- when you say brothers, you mean brothers-

24  in-law?

25  A    Brother-in-law, brother-in-law.  Let me explain to you

## <u>Moreno - Direct</u>                                         26

1  something.  These notes right here came about in 1999.  In

2  1999, Mr. Bryson was representing me and he asked Judge Holland

3  that they could not use the evidence from Mr. Echevarria as

4  stated in my PSI as a relevant conduct.  That's when these

5  notes came about because even Judge Holland -- can I call you

6  Judge Holland?

7            THE COURT:  (No audible reply)

8  A    Judge Holland asked Mr. Burgess if these notes were have

9  given to us as part of the discovery, and Mr. Tim Burgess at

10 the time who was the prosecutor even answer to the Court in

11 this matter.  This right here -- stated right here.  You, Judge

12 Holland, asked him if they have provided these notes in the

13 discovery and he says, no, they -- they have not been available

14 then.  Says right there.  And then he says they were made after

15 the plea agreement in 1994.  So why didn't they bring them up

16 in the discovery in 1999 they were provided to us?  And the

17 first time I ever saw these notes was at -- at the sentencing

18 hearing in 1999.

19                          (Pause)

20 That's why they nev -- they never gave us the originals 'cause

21 they're not original notes.  These are photocopies of somebody

22 else's and they just put my name on it with these dates on it,

23 too.

24                          (Pause)

25 BY MR. FLEISCHER:

1    Q    Now you were asked by Judge Holland at the outset of this

2    hearing whether you had read over the presentence report --

3    A    Yes, I did.

4    Q    -- is that correct?

5    A    Yeah.

6    Q    And you filed a response to that presentence report in the

7    presentencing memorandum, is that correct?

8    A    Yes, I did.

9    Q    And you agree with those specific statements of fact in

10   there -- in the objections that were set out in the presentence

11   report response, is that correct?

12   A    Yeah.  Yes.

13   Q    All right.  When you were convicted, did the jury enter a

14   special verdict?

15   A    Yes, they did.  They convicted me for less than five

16   kilos --

17           MR. BOTTINI:  Your Honor, I'm going to object to Mr.

18   Moreno testifying about what in essence is a legal issue.

19           THE COURT:  Okay.  You may answer.

20           MR. FLEISCHER:  Well, I think it's a question of

21   fact --

22           THE COURT:  You may answer.

23           MR. FLEISCHER:  -- that he's familiar with.  Go

24   ahead.

25   A    Yeah, I was convicted of less than five kilograms of

1  cocaine, and at that time I asked my attorney, Mr. Scott

2  Dattan, that if they had had these notes, then why weren't they

3  putting these on -- in front of the jury to be proven beyond a

4  reasonable doubt?  Because I was going to bring my attorney

5  from 1994, Mr. Gerald B. Scotty (ph) to testify and to clarify

6  that these notes were not made in front of us in 1994.

7  BY MR. FLEISCHER:

8  Q    'Kay.

9  A    See, in 1994 -- on March 14th, 1994, that was the first

10  interview I had with Mrs. Henderson, my attorney and I.  She

11  never took any notes.  There was no notes taken on that day.

12  Q    How long did that interview last?

13  A    That interview only lasted about thirty minutes because we

14  had an extensive court date on March 14th, 1994.  First of all,

15  there was a change of plea, I pled guilty, and then after that

16  we -- they try to revoke my -- my bail that I posted in Los

17  Angeles, and it took -- we took a recession and it -- and it

18  went on for another two or three hours, and at the end of the

19  day, they let me stay out on bond.  So from there, we went to

20  her office and it was her, Mr. Timothy Burgess, my attorney,

21  and I, and there were no notes taken in front of us.  It even

22  says on the sentencing hearing of 2002 where Mr. Gerald B.

23  Scotty testify that he never saw any notes.  And as a general

24  practice, if -- I believe that if -- if a prosecutor was

25  present at that interview, why don't we have Mr. Burgess'

1  notes?  I don't -- I don't -- I don't understand why we only

2  have Mrs. Henderson notes and not the prosecutor.

3  Q    Tell a little about your family and your family situation,

4  Mr. Moreno.

5  A    My family situation?

6  Q    Yeah.  What is your family -- describe your family.

7  A    My family -- I have my wife, but she's still waiting for

8  me.  I've been married to her for twenty-three years.  And I

9  got two daughters.

10 Q    What are their ages?

11 A    Erica and Trisha, they're -- Erica's nineteen, I left her

12 when she was twelve and a half when I came to jail, and also I

13 have Trisha, she's now sixteen.

14 Q    What have you been doing while you've been in the Bureau

15 of Prisons?

16 A    I have been teaching G.E.D in Spanish for -- for six

17 years.  That's been my job for six years.  And also, I now

18 teach substance abuse in Taft, California, at the AA meetings.

19        MR. FLEISCHER:  I have nothing further for Mr. Moreno

20 at this time.  Thank you, Your Honor.

21        THE COURT:  Mr. Bottini?

22                     **CROSS-EXAMINATION**

23 BY MR. BOTTINI:

24 Q    Mr. Moreno, the events which led to the Indictment against

25 you in this case took place in 1993, is that correct?

1  A    1993, sir.

2  Q    Okay.  And you were indicted by a grand jury here in

3  Alaska in November of 1993.

4  A    Yes, sir.

5  Q    All right.  Now in the spring of 1994, you entered into a

6  plea agreement with the United States, correct?

7  A    Yes, sir.

8  Q    All right.  In fact, you stood in front of Judge Holland

9  and you pled guilty to what you were charged with in the

10  Indictment, right?

11  A    No -- no, sir.  I pled guilty for possessing two kilograms

12  of cocaine in L.A.

13  Q    And that's what you were charged with in the Indictment,

14  right?

15  A    Yeah, I was -- I was charged in the Indictment with

16  conspiracy, not with possession to -- to distribute.

17  Q    All right.  Well, you entered a guilty plea --

18  A    I enter a guilt --

19  Q    -- and as we know --

20  A    I enter a guilty plea exactly.

21  Q    -- later on --

22  A    Yes.

23  Q    -- the Ninth Circuit decided --

24  A    Yes.

25  Q    -- that --

1    A    Yeah.

2    Q    -- the elements you were advised of weren't correct,

3    correct?

4    A    Yes, you're right, you're right.

5    Q    All right.  Now at that same time that you entered into

6    the guilty plea, at or near that time, you agreed to cooperate

7    with the Government, right?

8    A    To some extent, yeah.  To what I knew, what I told my

9    attorney.  I didn't know what my attorney wanted, and I said

10   okay, I will cooperate with whatever --

11   Q    You agreed to cooperate --

12   A    -- with what --

13   Q    -- with the Government, right?

14   A    Yes, I did.

15   Q    All right.  Now after you entered into that agreement, you

16   sat down with Agent Henderson and with Tim Burgess and with

17   your attorney, Mr. Scotty, correct?

18   A    Yes, sir.

19   Q    All right.  And you told Agent Henderson a number of

20   things, right, about your involvement in the facts leading up

21   to the Indictment, as well as other incidents, right?

22   A    No, I didn't, sir.

23   Q    All right.  So you never told her --

24   A    I never told her at -- anything, especially about a dead

25   person that I did not know.  She tells in these notes about

1  Gustavo Velez when she was dead.

2  Q    Let me ask you this.

3  A    Okay.

4  Q    Did you tell her anything about prior dealings you had

5  with Mr. Echevarria?

6  A    No.  No, sir, I didn't.

7  Q    All right.  So --

8  A    The only thing --

9  Q    So it's your testimony then when she sat there in the

10  witness stand at your sentencings in 1999 and 2002, she just

11  made that up?

12  A    She just made it up.  She asked me about gus -- you know

13  who she asked me about?  Jorge Jiminez.

14  Q    That's what I wanted to establish.  It's your testimony

15  that she lied to Judge Holland twice under oath.

16  A    Yes, she did.

17  Q    All right.  Now --

18  A    May I -- may I say something?  She asked me about --

19  Q    No, I'm asking the questions here.  If Mr. Fleischer wants

20  to redirect you on this, he'll do that.

21  A    Okay.

22  Q    I just want to establish that --

23  A    Okay.

24  Q    -- you're calling Agent Henderson a liar.

25  A    Yes, she is, sir.

1    Q    All right.  Now she also testified about statements you

2    made about other prior dealings you had with Gustavo Velez-

3    Montoya, right?

4    A    Sir, she did -- says that on the notes, but I have never

5    told her anything about Gustavo Velez.

6    Q    Okay.  So she lied about that, too, right?

7    A    I -- I didn't know the man.

8    Q    All right.  So --

9    A    I did not know him.

10   Q    -- she lied about that, too, is that right?

11   A    Yes, she -- she perjure herself.

12   Q    All right.  That's --

13   A    That's the same way --

14   Q    -- what I want to establish is --

15   A    -- as she fabri -- the same way she fabricated these

16   notes.

17   Q    Okay.  All right.  That's what I wanted to get -- to get

18   to the bottom of.  Now Mr. Moreno, after you entered your

19   guilty plea in 1994, you took off, right?  You fled.

20   A    No, I did not fled.  I call -- what happened was on the

21   15th of March, 1994, the day after I enter into a guilty plea,

22   I came here and I met with my probation officer.

23   Q    Mm-hmm (affirmative).

24   A    I don't know if you have read the probation -- the

25   probation officer's presentence report.  I denied all the

1  allegations that she's -- lady -- that this lady's making on

2  these notes.  How can -- in one day, I'm going to tell her --

3              MR. BOTTINI:  Your Honor, I'm going to object at this

4  point.  It's non-responsive.

5  A    Okay.  What is it that -- that you want me to say?  I

6  mean, repeat the question again, please.

7              THE COURT:  Ask him the question again.

8  A    Yeah.

9              MR. BOTTINI:  All right.

10  BY MR. BOTTINI:

11  Q    You pled guilty and you were given a date to appear here

12  again in the United States District Court for sentencing,

13  right?

14  A    Yes, sir.

15  Q    You didn't show up for that, did you?

16  A    No, I didn't.

17  Q    You fled, right?  I mean, you took off.

18  A    Yes, I did.

19  Q    All right.  And you were on the road, you were gone, for

20  five years, right?

21  A    Yes, I was.

22  Q    All right.  And for that, you've been assessed a two-level

23  enhancement for obstruction of justice, correct?

24  A    Yes, I have.

25  Q    All right.  So you know, don't you, Mr. Moreno, that

1   basically you can -- because you've already been assessed two

2   levels for obstruction of justice, you can sit here today and

3   lie with impunity, right?

4   A    I'm not lying.  I'm just telling you the truth.

5   Q    Okay.  But what's the worst than can happen to you?

6   You've already received the enhancement for obstruction of

7   justice, right?

8   A    I'm just -- I just want Judge Holland to hear the truth.

9                MR. BOTTINI:  Now --

10                          (Pause)

11  Just look at my notes here.  I think I -- I may be done, Mr.

12  Moreno.  I don't think I have any other questions for you.

13               THE COURT:  Mr. Fleischer, anything further?

14               MR. FLEISCHER:  Just a few more, Your Honor.

15                      **REDIRECT EXAMINATION**

16  BY MR. FLEISCHER:

17  Q    In regards to that meeting you had with Agent Henderson

18  and Mr. Burgess, what was the subject of the discussion, Mr.

19  Moreno?

20  A    The discussion was -- she asked me if I knew about illicit

21  conduct of Mr. Jiminez, which he was going to be in trial the

22  week after that meeting, March 14th, 1994.

23  Q    All right.

24  A    And right after the get-go --

25  Q    And what information did you have about Mr. Jiminez,

1  Miss --

2  A    Okay.   They wanted to know what was his role in the

3  conspiracy in Anchorage, Alaska.  And what I told Mrs.

4  Henderson is that I didn't know anything with any drug dealings

5  of Mr. Jiminez in Anchorage.  And right after that, she was

6  mad, she started complaining and we had a conflicting -- a

7  conflicting session.

8  Q    All right.  Mr. Bottini told you that you could lie with

9  impunity in this hearing.  Did you hear that --

10 A    I -- yeah --

11 Q    -- statement?

12 A    -- yeah, I did hear it.

13 Q    Were you not told that if you actually took the stand

14 under oath and took -- made statements, you could be charged

15 for perjury if you in fact lied on the stand?  An additional

16 charge, isn't that true?

17 A    Yes.

18         MR. FLEISCHER:  Nothing further, Your Honor.

19         MR. BOTTINI:  I don't have anything else.

20         THE COURT:  You may step down, sir.  Thank you.

21                    (Pause)

22 Mr. Fleischer, I want to be clear that we're all on the same

23 page here.  I'm to consider your client's testimony as his

24 exercise of his right of allocution?

25         MR. FLEISCHER:  Yes, Your Honor.

1          THE COURT:  And you agree with that, Mr. Moreno?

2          THE DEFENDANT:  Yes, sir.

3          THE COURT:  Thank you.

4               (Pause - side conversation)

5          MR. FLEISCHER:  No, I'm sorry, Your Honor.  He would

6    like to exercise his right to allocution in addition to his

7    testimony.  My mistake.

8          THE COURT:  What was his mistake?  I can understand

9    yours.  Are you telling me that you've changed your mind, Mr.

10   Moreno?

11         THE DEFENDANT:  Oh, I didn't -- I didn't hear what

12   you said, Your Honor.

13         THE COURT:  Then why did you answer yes to me?

14         THE DEFENDANT:  I am sorry.  I -- I didn't understand

15   what you said.

16         THE COURT:  Mr. Fleischer, back to you on the

17   question of whether or not there are non-guideline matters

18   which would cause the Court to impose the sentence different

19   from that which the guidelines advise?

20         MR. FLEISCHER:  Yes, there are, Your Honor.  In 18

21   U.S.C. 3553, factors to be considered in imposing a sentence

22   under (a)(2), the need for the sentence imposed, going down to

23   (c), to protect the public from further crimes of the

24   defendant.  We propose that under that provision, that Mr.

25   Moreno, who is forty-five years of age at this time, has a

38

1    substantially reduced risk of recidivism.  The United States

2    Sentencing Commission of the Federal Sentencing Guidelines at

3    12 said that recidivism rates decline relatively consistently

4    as age increases.  As an example, from thirty-five point five

5    percent under twenty-one years of age to nine point five over

6    fifty.

7            He's in the latter area of that, and we think that

8    that makes it very clear that there is a great -- and of course

9    there are additional incentives for him to not commit

10   additional crimes by virtue of the fact that he's discussed his

11   family and the fact that he wants very much to be with them in

12   a lawful way as opposed to being involved in any additional

13   illicit conduct.  So we feel that under 2C of the statute, that

14   should be taken into account.

15           And we think additionally that given the fact that

16   he's already heavily involved in vocational training, that that

17   is an area where he should be getting additional training from

18   -- so that he can carry on with teaching persons who have

19   Spanish as their major language to reach G.E.D. and other

20   education responsibilities.

21           And I think in that regard, Your Honor, the fact of

22   the matter is, and I think you can take judicial notice of

23   this, the Bureau of Prisons has scaled back dramatically in

24   their efforts to actually have training, schooling, and other

25   matters that should be involved in terms of rehabilitation.  I

1  mean, they scrapped the shock incarceration program which most

2  people felt was one of the better programs of the Bureau of

3  Prisons.  It was very intensive and very involved course of six

4  months in which persons were going through regimental aspects

5  and has been very successful, but that was put off as well as

6  other BOP programs.

7           THE COURT:  Mr. Fleischer, I'm hearing you, but I'm

8  not really understanding where --

9           MR. FLEISCHER:  Well, we think --

10          THE COURT:  -- what you want me to do here?  Are --

11          MR. FLEISCHER:  Well, we think -- we think --

12          THE COURT:  -- are you saying he needs training or

13 that he's a good guy because he's doing training?

14          MR. FLEISCHER:  Well, he -- we think that he is a

15 good guy for doing the training, we think that should be taken

16 into account, but we're saying under that provision, under

17 3553, to provide him with the needed education and vocational

18 training that whatever additional information that he could get

19 to be a better teacher is not present in the Bureau of Prisons.

20 We think that given the fact that he's been doing this for six

21 years, that he should be doing that in a community situation

22 and not in the prisons anymore, and through a halfway house or

23 other aspect because there he can actually get a much better

24 foundation for doing the teaching that he is clearly devoted

25 to, because the Bureau of Prisons simply does not have the

40

1    facilities to give him that additional training.  So that's

2    what we think is clear under 3553, Your Honor.

3                THE COURT:  Mr. Bottini?

4                MR. BOTTINI:  Very briefly, Your Honor.  It's our

5    position, as we set out in our memorandum, that the 3553

6    factors are necessarily subsumed into the guidelines

7    themselves, and I believe you noted in your procedure order

8    here that there's -- you recognize there's a presumption that

9    one, two and six are already subsumed.  But we feel that the

10   guidelines themselves weigh all these factors and necessarily

11   were built into the sentencing guideline scheme.

12                            (Pause)

13                THE COURT:  At this point, I want to hear Mr.

14   Moreno's further allocution.  After I hear that, I'm going to

15   ask each of the attorneys for their final recommendation as to

16   what sentence I should impose in this case.  Mr. Moreno?

17                THE DEFENDANT:  Yeah, Your Honor.

18                MR. FLEISCHER:  (Indiscernible - away from

19   microphone)

20                THE COURT:  We'll all hear --

21                THE DEFENDANT:  Can I be seat -- can I --

22                THE COURT:  We'll all hear better if you remain

23   seated.

24                     **DEFENDANT'S ALLOCUTION**

25                THE DEFENDANT:  Oh, okay.  Okay.  What I would like

1    to say is that I -- I'm really sorry about what I have done in

2    the past.  I do pray for you to lower my sentence so I can be

3    back out there and prove to my family and take care of my sick

4    mother, which she has cancer now, and prove to them that I have

5    changed, that I have know the impact and the troubles and the

6    suffering that I have created for one little mistake -- I mean,

7    huge mistake, what I will say, and for this little thinking

8    that -- that I actually ruined my life and I have ruined my

9    wife's life and my whole family's life.

10             And now that I been incarcerated for over six years,

11   I would like to make the world better.  I would like to be

12   someone better in the society.  I think I had already enough

13   time to realize what drugs do to people, what I have done to

14   people, and honestly, I -- I teach every day, I preach almost,

15   what I'm telling you right now, what drugs do to people, what

16   drugs do to families, to see these communities, and I pray for

17   you to see in me -- like my attorney said, I'm forty-five years

18   old.  I would like to -- to be back with my family as soon as

19   is possible.  I seen all the damage that -- that drugs do to

20   people, cost, and I -- I pray you have mercy for me.  That's

21   it.

22             THE COURT:  Thank you.

23             **DEFENDANT'S SENTENCING RECOMMENDATIONS**

24             MR. FLEISCHER:  Your Honor, the -- Mr. Moreno

25   reiterates the position that we took before.  We do not believe

42

1  that the relevant conduct is capable of taken into account

2  under the authorities that we've previously advised.  We

3  further think that if -- looking at the underlying relevant

4  conduct, that it is highly suspect and not capable of being

5  reasonably taken into account in this sentencing matter.

6           And, therefore, we believe that the jury verdict of

7  -- special verdict of more than five hundred grams but less

8  than five kilograms should be the determinative factor in this

9  sentencing, which has a mandatory minimum of five years or

10  sixty months, with the other provisions that were discussed,

11  and that is our request.  Thank you.

12          THE COURT:  Before you sit down, Mr. Fleischer, where

13  are you if, as I've already suggested, I reject your theory

14  that relevant conduct shouldn't be considered and reject your

15  position that the relevant conduct in fact took place?  What

16  should I do in that event?

17          MR. FLEISCHER:  Well, I mean the -- the relevant

18  conduct that you're talking about gets him to the -- a level

19  twenty-six.

20          THE COURT:  No, sir.

21          MR. FLEISCHER:  Or I'm sorry --

22          THE COURT:  The relevant conduct I'm talking about

23  gets him to thirty-six.

24          MR. FLEISCHER:  Thirty-six is what I meant to say,

25  excuse me.  My mistake.  And -- I mean, the low end of the

43

1  sentencing guidelines for thirty-six is two hundred and thirty-

2  five months.  We think that under 18 U.S.C. 3553, that the

3  equally important factors that should be looked that in

4  addition to the sentencing guidelines should lower his

5  sentence.  We think that, you know, based upon his age alone,

6  which is really contrary to what Mr. Bottini said -- I mean,

7  the sentencing guidelines simply did not take any account of

8  two --

9          THE COURT:  They tell me to ignore it.

10          MR. FLEISCHER:  Well, basically told you to ignore

11  it, but the -- but the fact of the matter is we think under

12  3553(c)(2) or -- two, yes -- that one can take account for age

13  and we have specifically argued that, and the -- we feel that

14  the prospect of recidivism, particularly with this defendant

15  and what he's been doing in the Bureau of Prisons and the

16  family connection that he has is a true factor, and we think

17  that of itself should be a basis for reducing his sentence.

18          And we think that even though the sentencing

19  guidelines would require two hundred and thirty-five months at

20  the lowest, we feel that under that matter, which is, you know,

21  really paramount in a large way to protect the public from

22  other crimes, other illicit conduct this matter -- this man

23  could be involved with.  We don't think that that is a problem

24  here because of the nature of this defendant and because of the

25  research that we've cited under the U.S. Sentencing Guidelines

44

1    provision.

2            And we think that on that basis alone, that his

3    sentence could and should be lowered down to seventy-two

4    months, which is the amount that he has served.  Thank you,

5    Your Honor.

6            THE COURT:  Mr. Bottini?

7                **PLAINTIFF'S SENTENCING RECOMMENDATIONS**

8            MR. BOTTINI:  Well, Your Honor, as you know, we have

9    requested that you reimpose the sentence that you've imposed

10   twice before in this case, and that is a sentence of two

11   hundred and thirty-five months.  It's the low end of the

12   resulting guideline range, which we feel is the reasonable and

13   appropriate sentence in this case.

14           I have to tell you though that listening to Mr.

15   Moreno testify here today, I'm somewhat tempted to recommend

16   that you give him more time.  It would have been a lot more

17   palatable if he would have perhaps suggested that Agent

18   Henderson got that four kilos wrong, and no I talked -- she got

19   that -- but to sit there and suggest that she manufactured the

20   whole thing, I mean, holy smokes.  Mr. Echevarria [sic] hasn't

21   learned much in the six years that he's been serving time.

22           Agent Henderson, as you know, was a career agent.

23   She, you know, served sixteen years in this district, won

24   awards from the FBI.  She was as good as they come.  And you

25   know, to suggest that she would have simply manufactured

45

1  wholesale this information about relevant conduct -- you know,

2  Mr. Moreno ought to think long and hard about that.  And as I

3  said, I'm tempted to recommend that you give him more time for

4  sitting here and lying to you about that today.

5        But two hundred and thirty-five months is what you've

6  twice before, all things considered in evaluating the lengthy

7  history of this case, found was appropriate and reasonable, and

8  that is the sentence that the Government feels is reasonable in

9  this case.

10        There's just nothing unusual about this situation.

11  Mr. Moreno's forty-five years old, not that old, he's younger

12  than me, and I hopefully have some more mileage left on the

13  odometer.  To suggest that that means he's not going to re-

14  offend or recidivism is not a serious consideration, sitting

15  here and listening to him lie to you today, you know, certainly

16  doesn't, you know, score a lot of points in the I'm

17  rehabilitated category.  So two hundred and thirty-five months

18  I think is what the appropriate sentence ought to be.

19                        **COURT'S FINDINGS**

20        THE COURT:  Give me a moment, please.

21                          (Pause)

22        With respect to the request that the Court find under

23  non-guideline sentencing factors matters which would cause the

24  Court to impose a sentence outside of the guidelines, I am not

25  persuaded.  In my opinion, in this case, the characteristics of

1   Mr. Moreno, and in particular his age and the need for

2   protection of the public, which are the two matters which have

3   been focused on here, are adequately taken account of by the

4   guidelines.

5           With respect to age, the guidelines counsel that I

6   not consider age.  In this instance, the argument that is made

7   on behalf of Mr. Moreno is a fair one.  Recidivism probably

8   does decrease with age.  I don't have any doubt of that.  And

9   that, of course, feeds into the issue of protection of the

10  public, but there are some other concerns here, some other

11  characteristics of Mr. Moreno that cause me to reject the

12  notion that there should be some non-guideline departure -- I

13  wasn't going to use that word -- some non-guideline sentence

14  outside the guidelines in this case.

15          In the first place, much as I am impressed with Mr.

16  Moreno's teaching while in prison, and I am impressed with

17  that, I'm really disappointed by what he has told me in

18  allocution here today, and I'm focusing not on his unsworn

19  statement which was the normal I'm sorry, give me a break

20  pitch, I'm talking about his sworn testimony.

21          His sworn testimony here this morning is not

22  credible.  I don't believe it.  I believe Mr. Moreno has

23  perjured himself here this morning.  I had hoped to hear

24  something different from you, sir.  I had hoped to hear some

25  serious contrition from you and it just isn't there.  I'm

1  firmly convinced that you are deeply involved in kilo dealing

2  in cocaine and because of that conviction and your attacking

3  Agent Henderson rather than fessing up to what you've been

4  involved in, leaves me convinced that there is some continuing

5  need to protect the public in this case, and that you have not

6  -- you've not yet seen the handwriting on the wall.

7           There will be no non-guideline sentencing in this

8  case.  I'm satisfied that the guidelines adequately and

9  properly guide and advise me in this case.

10                    **IMPOSITION OF SENTENCE**

11          Based upon my finding that the total offense level

12  here is three and that the criminal -- I'm sorry -- that the

13  total offense level is thirty-six and that the criminal history

14  category is three, it is the judgment of the court that Jaime

15  Ernest Moreno be committed to the custody of the United States

16  Bureau of Prisons for imprisonment for a term of two hundred

17  and thirty-five months with credit for time served.

18          Upon release from imprisonment, defendant shall be on

19  supervised release for a term of five years.  Within seventy-

20  two hours of his release from custody of the Bureau of Prisons,

21  he shall report in person to the probation office in the

22  district to which he is released.

23          While on supervised release, the defendant shall not

24  commit another federal, state or local crime, shall not possess

25  a firearm or illegal controlled substance -- I'd appreciate it

1  if you'd listen to the sentence that I'm imposing, Mr. Moreno.

2  You really need to know about it.

3          While on supervised release, the defendant shall not

4  commit another federal, state or local crime, shall not possess

5  a firearm or illegal controlled substance, and shall comply

6  with the standard conditions of supervision which will appear

7  in printed form in the Court's judgment.

8          In this sentence, the usual mandatory condition of

9  supervised release requiring a defendant to submit to drug

10  testing will not be imposed because it was not in effect at the

11  time of this offense; however, the following special conditions

12  are imposed:

13          First.  The defendant shall cooperate in the

14  collection of a DNA sample from the defendant as directed by

15  his probation officer.

16          Second.  He shall comply with the rules and

17  regulations of the Bureau of Immigration and Customs

18  Enforcement, and if deported from the United States either

19  voluntarily or involuntarily, shall not reenter the United

20  States illegally.  Upon any reentry into the United States

21  during the period of court-ordered supervision, the defendant

22  shall report in person to the nearest probation office within

23  seventy-two hours.

24          Third.  The defendant shall submit to the warrantless

25  search of his person, residence, vehicle, or place of

49

1   employment at a reasonable time, in a reasonable manner, and

2   based upon a reasonable suspicion of the presence contraband or

3   evidence of a violation of a term or condition of supervised

4   release.  Failure to submit to such searches may be grounds for

5   revocation of supervised release.  Defendant shall not reside

6   at any location without having first advised other residents

7   that the premises may be subject to searches pursuant to this

8   condition.

9          Finally, the defendant shall not possess a firearm,

10  destructive device or other weapon.

11         The Court finds that the defendant does not have the

12  ability to pay a fine, nor is the Court going to impose any

13  community restitution obligation in this case because of lack

14  of ability to pay.

15         The judgment should reflect a fifty-dollar special

16  assessment, but also should reflect that it has been paid.

17         Mr. Moreno, have the right to appeal this Court's

18  sentencing decisions to the Ninth Circuit Court of Appeals.  If

19  you wish to appeal, a notice of appeal must be filed within ten

20  days from the entry of the Court's judgment.  You should assume

21  that the Court's judgment will be entered today, so the time is

22  running.  If you wish to appeal and do not have the wherewithal

23  to hire an attorney, an attorney can be appointed at your

24  request to assist you with respect to any appeal.

25         With respect to the presentence report in this

50

1  instance, and while I recognize that the Bureau of Prisons

2  already has a report that has that gun information in it, I

3  would appreciate you removing the gun information from the

4  presentence report.  And while you're doing that, would you

5  please incorporate the corrections with respect to criminal

6  history that were affected by the supplement into the report so

7  that there's one integrated document?

8          THE PROBATION OFFICER:  Yes, sir.

9          THE COURT:  Mr. Bottini, is there anything else we

10  need to do?

11          MR. BOTTINI:  No, sir.

12          THE COURT:  Mr. Fleischer?

13          MR. FLEISCHER:  Nothing else, Your Honor.

14          THE COURT:  Thank you.  We're in recess subject to

15  call.

16          THE CLERK:  All rise.  This matter's now adjourned.

17  This Court stands in recess subject to call.

18      (Proceedings concluded at 10:02 a.m.)

19

20

21

22

23

24

25

1

**INDEX**

2

3

|                                         | Direct | Cross | Redirect | Recross | Further Redirect |
|-----------------------------------------|--------|-------|----------|---------|------------------|

4

<u>WITNESSES FOR THE
DEFENDANT</u>:

5

6

| Jaime Moreno | 22 | 29 | 35 | | |

7

8

<u>Page</u>

9

DEFENDANT'S ALLOCUTION                                          40

10

DEFENDANT'S SENTENCING RECOMMENDATIONS: Mr. Fleischer          41

11

PLAINTIFF'S SENTENCING RECOMMENDATIONS: Mr. Bottini           44

12

COURT'S FINDINGS                                               45

13

IMPOSITION OF SENTENCE                                         47

14

15

16

17

18

19

20

21

22

23

24

25

1    **CERTIFICATE**

2    I certify that the foregoing is a correct transcript from the
3    electronic sound recording of the proceedings in the above-
     entitled matter.

4

5    ~~Donna K. Chertkow~~                          ~~June 14, 2005~~

6    Signature of Approved Transcriber                    Date

7

     DONNA K. CHERTKOW
8    Typed or Printed Name

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**NoDak Rose Transcripts**
721 North 19th Street
Bismarck, North Dakota 58501-4721
(701) 255-1054